[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 13-11882
_____

D.C. Docket No. 5:09-cv-00081-MCR


KAYLE BARRINGTON BATES,

                                                    Petitioner-Appellant,

versus

SECRETARY, FLORIDA DEPARTMENT OF CORRECTIONS,

                                                    Respondent-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Florida
_____

(September 5, 2014)

Before CARNES, Chief Judge, TJOFLAT and WILSON, Circuit Judges.

ED CARNES, Chief Judge, and TJOFLAT, Circuit Judge:[1]

_____

[1] This opinion was written jointly by Chief Judge Carnes and Judge Tjoflat.  Cf. Florida ex rel. Atty. Gen. v. U.S. Dep't of Health & Human Servs., 648 F.3d 1235, 1240 n.1 (11th Cir. 2011) (jointly authored opinion); Waters v. Thomas, 46 F.3d 1506, 1509 n.1 (11th Cir. 1995) (en

On the afternoon of June 14, 1982, Janet White, a State Farm Insurance clerk, returned from lunch around 1:00 p.m., as was her normal practice. As she came into the office, she answered the phone. Unknown to her, she was not alone. She knew that Kayle Barrington Bates had stopped by the office earlier that day, talked with her, and left. She did not know that, having seen that she was alone in the office, Bates had returned to the area and parked his truck in the woods some distance behind the building where it could not be seen and waited. She did not know that while she was out at lunch he had broken into the office and was there waiting for her to return. When Bates surprised White she let out a "bone-chilling scream" and fought for her life. He overpowered her and forcibly took her from the office building to the woods where he savagely beat, strangled, and attempted to rape her, leaving approximately 30 contusions, abrasions, and lacerations on various parts of her face and body.

The state trial judge in his sentencing order found that during the attack Bates had stolen White's diamond ring "by tearing it from her left ring finger" and in the process severely injured her. "While being attacked, robbed, bruised, lacerated, strangled and stabbed [she] was still alive." Death resulted from the stab

---

banc) (jointly authored opinion). Part III was authored by Judge Tjoflat, while the remainder was authored by Chief Judge Carnes.

wounds but was not immediate; it "came only some five to ten minutes after this brutal and senseless attack."

## I.

As a result of his crimes against Janet White, Bates is now on death row in Florida. This is his appeal from the denial of federal habeas relief. In accordance with the certificate of appealability that we granted, Bates challenges his convictions and capital sentence on two grounds. As to his convictions, Bates contends that his trial counsel was constitutionally ineffective for failing to object to an opening prayer, which was delivered in the presence of the jury venire by a minister of the church where the victim's funeral service had been held. As to his death sentence, he relies on Simmons v. South Carolina, 512 U.S. 154, 114 S.Ct. 2187 (1994), to contend that his due process rights were violated at his capital resentencing proceeding when the trial court refused to instruct the jury that Bates had agreed to waive his eligibility for parole, and that he had already been sentenced to two life terms plus fifteen years on his other counts of conviction, which would run consecutively to any sentence imposed for first-degree murder.

## A.

It was in 1982 that Bates was indicted in Bay County, Florida, for the first-degree murder, kidnapping, sexual battery, and armed robbery of Janet Renee White. Before the beginning of jury selection for the 1983 trial, the judge asked

3

those present in the courtroom, including the members of the jury venire, to stand while Reverend N.B. Langford of the First Baptist Church opened the proceedings with a prayer. Reverend Langford then gave the following invocation:

> May we pray together. Father, this is a beautiful day that you've given to each of us, and we thank you for the privilege that's ours to enjoy all the bounties that you've given to each of us. Lord, we pray for the seriousness of the situation with which we're confronted, and we ask for your wisdom and your guidance, Father, upon all who are involved, we pray for the Judge as he presides for your special wisdom and for your guidance to do upon his life. Thank you, Father, that we live in a country that has freedom for all, and we ask now for your leadership and your blessings upon the judicial system, for in Christ's name I pray, Amen.

Bates' court-appointed counsel, Theodore Bowers, did not object to the prayer and the court proceeded with jury selection. The next day the prosecution called its first witness, the victim's husband. He testified, among other things, that he had last seen his wife at the First Baptist Church as her coffin was being closed during her funeral service. Bowers did not object to that testimony.

The evidence of guilt presented against Bates during the three-day trial was overwhelming, as the Florida Supreme Court's summary of it shows:

> Bates was arrested at the scene of the crime just *minutes* after the victim's death. He had the victim's diamond ring in his pocket, and he tried to conceal it from law enforcement officers. A watch pin consistent with Bates' watch was found inside the victim's office, and Bates' watch was missing a watch pin. Footprints consistent with Bates' shoes were found behind the State Farm office building. Bates' hat was found near the victim's body. Two green fibers were found on the victim's clothing — one on her blouse and one on her skirt — that were consistent with the material that Bates' pants were

4

made of.  A knife case was found near the victim's body, and that case was identified by various witnesses as being the exact type that Bates wore. The victim's two fatal stab wounds were consistent with the type of buck knife that Bates carried in that case. The consistency between the stab wounds and Bates' knife was striking; the wounds were four inches deep, and Bates' knife was four inches long; the width of the wounds was consistent with the width of Bates' knife; and as was testified to at the resentencing, there were abrasions at the bottom of the wound that were consistent with marks that Bates' knife would have made. Bates' statements to investigators and at his trial also placed him either at the scene of the crime or directly involved in the victim's murder. Bates stated during a telephone call to his wife after his arrest that he killed a woman.

Bates v. State, 3 So. 3d 1091, 1099 (Fla. 2009).

The jury convicted Bates of first-degree murder, kidnapping, armed robbery, and attempted sexual battery (a lesser-included offense of the crime of sexual battery that was charged in the indictment).  It recommended a sentence of death on the murder count.  The judge followed the jury's recommendation, sentencing Bates to death for the first-degree murder of White, and imposing two life sentences plus fifteen years imprisonment on the three remaining counts of conviction, all of which were to run consecutively to each other.  In support of the death sentence the judge found five statutory aggravating circumstances and one statutory mitigating circumstance.  See Bates v. State, 465 So. 2d 490, 492 (Fla. 1985).

On direct appeal, the Florida Supreme Court affirmed Bates' convictions and non-capital sentences, but vacated the death sentence and remanded for

5

resentencing on the murder conviction because the trial court had erroneously found two aggravating circumstances. Id. at 492–93. On remand the trial judge determined that the remaining aggravating circumstances still outweighed the statutory and non-statutory mitigating ones, and he again sentenced Bates to death. The Florida Supreme Court affirmed. Bates v. State, 506 So. 2d 1033 (Fla.), cert. denied, 484 U.S. 873, 108 S.Ct. 212 (1987).

B.

After his death warrant was signed in 1989, Bates filed a state post-conviction motion under Florida Rule of Criminal Procedure 3.850. Among other claims for collateral relief, Bates asserted a claim under the First Amendment's Establishment Clause, contending that his convictions and capital sentence were improperly obtained because the trial began with a prayer from the victim's minister. He also raised a related Sixth Amendment claim of ineffective assistance of counsel based on his trial attorney's failure to object to the Reverend's opening invocation. The trial judge recused himself from ruling on the Rule 3.850 motion and was replaced by a different judge. At an evidentiary hearing on that motion, Bates' trial counsel testified that he thought "nothing of the prayer" because it neither encouraged the jury to convict nor acquit Bates. However, in a self-described act of "pure speculation," counsel opined that the prayer could have

6

prejudiced Bates given the "racial tension" involved in the case. (Bates is black and his victim was white.)

The state trial court summarily rejected Bates' claims regarding the prayer, but granted him a new sentence hearing based on defense counsel's ineffective assistance during the second penalty hearing before the jury. See Bates v. Dugger, 604 So. 2d 457, 458–59 (Fla. 1992). The Florida Supreme Court affirmed that decision in all respects, including the denial of Bates' dual challenges arising from the prayer. The court rejected Bates' substantive Establishment Clause challenge as procedurally barred because it was not properly raised at trial, and it summarily rejected "[a]ny allegations of ineffectiveness raised incidentally" to that substantive claim as being "without merit." Id. at 459 & n.4.

## C.

Before Bates' 1995 resentencing proceeding (his third sentence proceeding before a jury), the Florida legislature amended Fla. Stat. § 775.082 to provide that a defendant convicted of capital murder could either be sentenced to death or to life imprisonment without the possibility of parole. See Fla. Stat. § 775.082(1) (1995) ("A person who has been convicted of a capital felony shall be punished by death . . ., otherwise such person shall be punished by life imprisonment and . . . shall be ineligible for parole."). The revised statute, which became effective on May 25, 1994, differed from the capital sentencing scheme in effect at the time of

7

Bates' 1982 crimes, under which life imprisonment <u>with</u> the possibility of parole after 25 years was the only alternative to death for the crime of first-degree murder. <u>See</u> <u>id.</u> § 775.082 (1983); <u>see also</u> <u>Hudson v. State</u>, 708 So. 2d 256, 262 (Fla. 1998).

Bates was concerned that the jury might sentence him to death to avoid the possibility that under a life sentence he could eventually be released from prison. He sought to avoid that by having the amended version of § 775.082, which provided life without parole as the only alternative to a death sentence, applied to him and the jury instructed that it could impose a life without parole sentence in lieu of death. Bates stated that he would waive any rights he had to parole eligibility under the pre-amendment version of § 775.082, along with any claim that retroactively applying the revised statute to his criminal conduct would violate ex post facto principles. The trial court denied Bates' request because life without the possibility of parole was not an available sentence at the time he committed first-degree murder, and he could not unilaterally elect to receive a sentence not authorized by state law. Bates also asked the trial court to inform the jury that he had already been sentenced to consecutive life terms plus fifteen years on his other counts of conviction, but the court denied that request as well.

After three hours of deliberations, the latest resentencing jury submitted the following note to the trial judge: "Are we limited to the two recommendations of

8

life with minimum 25 years or death penalty.  Yes.  No.  Or can we recommend life without a possibility of parole.  Yes.  No."  Instead of answering "yes" or "no," the trial court referred the jury to its written instructions.  After further deliberations, the jury recommended a death sentence by a vote of nine to three. The trial court followed that recommendation and, for the third time, sentenced Bates to death for the first-degree murder of White.

Bates appealed his latest death sentence to the Florida Supreme Court, contending that the trial court's refusal to instruct the jury that life without the possibility of parole was an available alternative to death violated due process and denied him a fundamentally fair capital sentence proceeding.  He also challenged the trial court's refusal to inform the jury about his other consecutive sentences. The Florida Supreme Court rejected those claims on the merits and affirmed the death sentence.  Bates v. State, 750 So. 2d 6 (Fla. 1999).  In doing so the court held that the amended version of Fla. Stat. § 775.082 did not apply retroactively to crimes committed before its effective date of May 25, 1994, because there was no clear legislative intent to overcome the presumption that state laws apply only prospectively.  Id. at 10; see also State v. Lavazzoli, 434 So. 2d 321, 323 (Fla. 1983) ("It is a well-established rule of construction that in the absence of clear legislative expression to the contrary, a law is presumed to operate prospectively.").  In view of that, the court concluded that Bates' attempted

9

waivers of parole eligibility and any ex post facto claims were "of no consequence" because he could not "by agreement confer on the [trial] court the authority to impose an illegal sentence," meaning one which was not statutorily authorized at the time he committed first-degree murder. Bates, 750 So. 2d at 10–11 (quotation marks omitted).

The Florida Supreme Court also held that Bates was not entitled to apprise the jury of his other consecutive sentences because that "evidence would open the door to conjecture and speculation as to how much [actual prison] time a prisoner serves of a sentence," which can be affected by "many factors other than the length of the sentence imposed by the sentencing court," and thus would "distract [the] jurors from the relevant issue of what is the appropriate sentence for the murder conviction." Id. at 11.

Thereafter, Bates filed another state post-conviction motion under Rule 3.850 challenging both his convictions and his latest death sentence, although that filing did not raise any issues involved in this appeal. The state trial court denied that motion and the Florida Supreme Court affirmed the denial. See Bates, 3 So. 3d 1091.

## D.

Bates filed his federal habeas petition in March 2009, asserting a large number of constitutional claims, including the two at issue in this appeal: (1) that

10

his trial counsel rendered ineffective assistance in failing to object to the prayer in the presence of the jury venire before voir dire, particularly once the victim's husband gave testimony implying that she had been a member of that minister's congregation; and (2) that his due process rights under Simmons were violated when, at his 1995 resentencing, the trial court refused to instruct the jury about his parole ineligibility.  In an order issued on September 28, 2012, the district court denied the 28 U.S.C. § 2254 petition, finding that his ineffective assistance claim was procedurally barred and that the Florida Supreme Court's rejection of his parole ineligibility claim was entitled to deference under the standards prescribed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA).

Bates filed a motion to alter or amend the district court's judgment under Federal Rule of Civil Procedure 59(e), contending that the court had erroneously found that his ineffective assistance claim was procedurally defaulted.  The court granted the Rule 59(e) motion, concluding that the Florida Supreme Court had indeed reached the merits of that claim, but determined that federal habeas relief was still not warranted because the state court's merits determination was entitled to AEDPA deference.  We later granted Bates a COA on two issues:  (1) whether trial counsel rendered ineffective assistance in failing to object to the prayer; and (2) whether "the trial court's refusal to instruct the jury about [Bates'] parole eligibility, including the effect of consecutive sentences he had left to serve, was

11

contrary to law established by the United States Supreme Court or objectively unreasonable in light of such precedent."

## II.

We review de novo the denial of Bates' § 2254 petition. Our review, like the district court's, is "greatly circumscribed" by the "highly deferential" standards mandated by AEDPA. See Wood v. Allen, 542 F.3d 1281, 1285 (11th Cir. 2008) (quotation marks omitted). Under that statute, a federal court may not grant habeas relief on a claim adjudicated on the merits in state court unless the state court's decision "was contrary to, or involved an unreasonable application of, clearly established [f]ederal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

The phrase "clearly established federal law" refers only to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." Williams v. Taylor, 529 U.S. 362, 412, 120 S.Ct. 1495, 1523 (2000); see also Putman v. Head, 268 F.3d 1223, 1241 (11th Cir. 2011) ("Clearly established federal law is not the case law of the lower federal courts, including this Court."). A state court decision is "contrary to" clearly established federal law if it either "applies a rule that contradicts the governing law set forth in [Supreme Court] cases" or "confronts a set of facts that are materially

12

indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a [different] result." Williams, 529 U.S. at 405–06, 120 S.Ct. at 1519–20. An "unreasonable application" of Supreme Court precedent, by contrast, occurs when the state court "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." Id. at 407–08, 120 S.Ct. at 1520. "[A]n unreasonable application of federal law is different from an incorrect application of federal law." Id. at 410, 120 S.Ct. at 1522. So long as "fairminded jurists could disagree on the correctness of the state court's decision," a federal habeas court may not grant relief. Harrington v. Richter, — U.S. —, 131 S.Ct. 770, 786 (2011) (quotation marks omitted).

## III.

Bates contends that his trial counsel was constitutionally ineffective for failing to object to Reverend Langford's opening prayer, either when it was delivered before voir dire in the presence of the venire or after the victim's husband testified that her funeral service was held at the Reverend's church. Bates insists that the prayer violated the First Amendment's Establishment Clause because "there was no constitutionally legitimate basis for the trial judge to inject" religion into the proceedings, and that it substantially impaired his due process right to a fair trial because it purportedly urged the jury to base its verdict on divine wisdom and guidance instead of the evidence adduced at trial.

13

Under clearly established federal law, a petitioner asserting a claim of ineffective assistance of counsel must demonstrate both deficient performance and prejudice—that counsel's performance "fell below an objective standard of reasonableness" and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland v. Washington, 466 U.S. 668, 687–88, 694, 104 S.Ct. 2052, 2064, 2068 (1984). "Judicial scrutiny of counsel's performance must be highly deferential," indulging the "strong presumption that counsel's conduct [fell] within the wide range of reasonable professional assistance" and bearing "in mind that counsel's function . . . is to make the adversarial testing process work in the particular case." Id. at 689–90, 104 S.Ct. at 2065–66. Because Strickland demands an "objective inquiry into the reasonableness of counsel's performance—an inquiry which asks only whether 'some reasonable lawyer' could have pursued the challenged course of conduct—a petitioner bears the heavy burden of showing that 'no competent counsel would have taken the action that his counsel did take.'" Gissendaner v. Seaboldt, 735 F.3d 1311, 1323 (11th Cir. 2013) (quoting Chandler v. United States, 218 F.3d 1305, 1315 & n.16 (11th Cir. 2000) (en banc)). And where the highly deferential standards mandated by Strickland and AEDPA both apply, the combined effect is a doubly deferential form of review which asks "not whether counsel's actions were reasonable," but whether "there is any reasonable argument

14

that counsel satisfied Strickland's deferential standards." Harrington, 131 S.Ct. at 788.

A.

Initially, we must untangle two versions of Bates's claim under Strickland. There is, first, the version Bates presented in his habeas petition, and then there is the version Judge Wilson, in his concurring opinion, proposes on Bates's behalf. Both versions concern the following sequence of events at Bates's trial. First, before jury selection, the trial judge invited a minister—introduced as "Reverend Langford of the First Baptist Church"—to open the proceedings with a prayer. One day later, at the guilt phase of the trial, the victim's husband testified that he last saw his wife "at First Baptist Church before they closed the coffin." Bates's trial attorney did not object to either event. Both Bates and Judge Wilson say the attorney should have objected, though for different reasons.

B.

Bates, for his part, argues that the pretrial prayer violated the Establishment Clause and that his lawyer, Theodore Bowers, rendered ineffective assistance of counsel for not recognizing and objecting to the Establishment Clause violation. See Pet'r's Br. at 27 ("[T]here was no constitutionally legitimate basis for the trial judge to inject religious prayers into the jury's choice of life or death in a capital case."). To support that claim, Bates cites cases from various jurisdictions

15

involving religious invocations at public assemblies, and he consistently describes his Strickland claim as being derivative of an underlying Establishment Clause violation.

The trouble for Bates here is that the Establishment Clause is not a trial right; a violation of the Establishment Clause at trial does not, standing alone, enable a criminal defendant to challenge his conviction. A proceeding might be thoroughly sectarian without being unfair for due process purposes, just as a proceeding might be thoroughly unfair without being violative of the Establishment Clause. They are simply different legal standards. To be sure, a person compelled by the state to be present at a sectarian proceeding can have standing to pursue a civil challenge to that proceeding under the Establishment Clause, see, e.g., McCreary Cnty. v. ACLU of Kentucky, 545 U.S. 844, 125 S. Ct. 2722, 162 L. Ed. 2d 729 (2005) (considering a civil challenge to officials posting the Ten Commandments on the walls of courthouses); North Carolina Civil Liberties Union Legal Foundation v. Constangy, 947 F.2d 1145 (4th Cir. 1991) (entertaining a civil application to permanently enjoin a judge from opening court with a prayer), but for the criminal defendant the religious character of a trial is relevant only to the extent that it affects the fundamental fairness of the proceeding, and no special standards govern our analysis when the alleged unfairness stems from religion, as opposed to some other factor.

16

A defendant's right to due process is violated if he is sentenced based on "factors that are constitutionally impermissible or totally irrelevant to the sentencing process, such as for example the race, religion, or political affiliation of the defendant." Zant v. Stevens, 462 U.S. 862, 885, 103 S. Ct. 2733, 77 L. Ed. 2d 235 (1983).  When religion is the basis of a due process challenge, courts look to whether the religious features of the trial substantially impaired the fairness of the proceeding; they do not ask, in the abstract, whether the events at trial violated the Establishment Clause.  See, e.g., United States v. Bakker, 925 F.2d 728, 740–41 (4th Cir. 1991) (vacating a sentence where "the trial judge abused his discretion and violated due process by factoring his own sense of religiosity and victimization into the sentence he imposed," and where the record showed "the explicit intrusion of personal religious principles as the basis of a sentencing decision" (emphasis added)); see also Deyton v. Keller, 682 F.3d 340, 348 (4th Cir. 2012) ("To the extent that the [trial] judge quoted from the Bible, there is . . . no credible argument that he impermissibly rested the chosen term of imprisonment on scripture and not on [state law]."); United States v. Hoffman, 626 F.3d 993, 999 (8th Cir. 2010) ("Nothing suggests that the district court's personal view of religion in any way influenced an aspect of [the defendant's] sentence."); United States v. Traxler, 477 F.3d 1243, 1249 (10th Cir. 2007) (concluding that a due process challenge to a judge's religious comments applies "only to those circumstances where

17

impermissible personal views expressed at sentencing <u>were the basis of the sentence</u>" (emphasis added)); <u>Arnett v. Jackson</u>, 393 F. 3d 681, 688 (6th Cir. 2005) (denying habeas relief where the trial judge had referred to a passage from the Bible, but "[t]here [was] nothing in the totality of the circumstances of [defendant's] sentencing to indicate that the trial judge used the Bible as her final source of authority" (quotation marks omitted)); <u>United States v. Walker</u>, 696 F.2d 277, 282 (4th Cir. 1982) ("[The defendants] are not entitled to such a reversal [of their convictions] unless the content of the prayer substantially impaired the fairness of their trial.").

Bates, in this case, wastes most of his habeas petition trying to relitigate the pretrial prayer as a violation of the Establishment Clause, and then—almost as an afterthought—connects the alleged First Amendment violation to his counsel's supposed negligence in failing to notice and object to the Establishment Clause violation.  <u>See</u> Pet. for Writ of Habeas Corpus, Doc. 1, at 54 (Mar. 16, 2009) ("If the mere installation of a statue bearing the Ten Commandments in a courthouse was sufficient for the United States Supreme Court to uphold an injunction barring the display, then certainly a prayer invoking God's blessing upon the jury and judge given by the minister of the victim in Mr. Bates's capital trial violated the First Amendment along with Mr. Bates's rights guaranteed under the Sixth, Eighth, and Fourteenth Amendments.").  This argument simply misses the mark: the

18

sectarian aspects of a trial are relevant only to the extent they make the trial unfair, and on the fairness question the Establishment Clause has nothing to teach us. It follows that Bates's lawyer could not be ineffective for failing to raise an Establishment Clause claim, because an Establishment Clause claim, by itself, would not help his client anyway.

## C.

Judge Wilson, in his concurring opinion, wants to rehabilitate Bates's Strickland claim by recasting it as an argument about fairness: Judge Wilson says "the jury was far less likely to be able to give Bates a fair trial after the prayer and the husband's testimony" were combined, and "any competent counsel would have objected." Wilson, J., Op. at 2 n.1. All of us on the panel agree that Bates is not entitled to relief on that claim, either, because Bates can cite no Supreme Court case supporting it, and therefore cannot show that the Florida Supreme Court decision denying relief was contrary to, or an unreasonable application of, clearly established law. See 28 U.S.C. § 2254(d)(2). Judge Wilson nonetheless volunteers that—were the issue to present itself on de novo review—he would readily grant relief on Bates's Strickland claim because he thinks the pretrial prayer "inserted God into Bates's trial, and the husband's testimony made clear whose side God was on," resulting in "obvious and significant prejudice" that all competent lawyers would object to. Wilson, J., Op. at 2, 6.

19

If that were an accurate description of what happened at trial, we might agree with Judge Wilson that Bates's trial was unfair. But Judge Wilson's account bears little resemblance to the trial transcript, which he does not quote from or cite to in making his argument. We will start by reprinting the parts of the trial transcript actually at issue, so as to ground the discussion in the record, and then consider the extratextual glosses Bates and Judge Wilson offer.

1.

On January 17, 1983, just before the start of voir dire, the trial judge asked the prospective jurors to stand as Reverend N.B. Langford "of the First Baptist Church" delivered the following prayer:

> May we pray together. Father, this is a beautiful day that you've given to each of us, and we thank you for the privilege that's ours to enjoy all the bounties that you've given to each of us. Lord, we pray for the seriousness of the situation with which we're confronted, and we ask for your wisdom and your guidance, Father, upon all who are involved, we pray for the Judge as he presides for your special wisdom and for your guidance to do upon his life. Thank you, Father, that we live in a country that has freedom for all, and we ask now for your leadership and your blessings upon the judicial system, for in Christ's name I pray, Amen.

Trial Record, Vol. I at 1211 (Jan. 17, 1983). So far, we'd say, so good. One could absolutely question the wisdom or propriety of starting trials this way[2]—and no

---

[2] See, e.g., Marsh v. Chambers, 463 U.S. 783, 805–06, 103 S. Ct. 3330, 3343, 77 L. Ed. 2d 1019 (1983) (Brennan, J., dissenting) ("[N]o American should at any point feel alienated from his government because that government has declared or acted upon some 'official' or 'authorized' point of view on a matter of religion."); United States v. Walker, 696 F.2d 277, 282 (4th Cir. 1982) ("The practice [of pretrial prayer] is a needlessly risky one. Because each

one on this panel is suggesting that the trial judge here was observing some kind of best practice—but as far as prayers go, this is pretty bland stuff.  The prayer did not incite the jury to vengeance or vindictiveness, but rather called for wisdom and solemnity "upon all who are involved"—including the defendant.[3]  One day later, after the jury had been selected and the guilt phase begun, the State called the victim's husband as its first witness at trial.  During that testimony, the prosecutor and the husband had the following exchange:

> **[THE STATE]**:  When was the last time you saw [the victim, Renee White] alive?
> **[HUSBAND]**:  June 14th, 1982, approximately between the hours of 12 and 12:30.
> **[THE STATE]**:  Where was that at?
> **[HUSBAND]**:  At our residence, 602 1/2 Colorado Avenue.
> **[THE STATE]**:  Was this for lunch?
> **[HUSBAND]**:  Yes.

---

minister composes his own prayer, its content is beyond the control of the judge.  A minister, knowing little of the ground rules for jury trials, may inadvertently say something that is prejudicial to a defendant. . . . We think the practice should be discouraged.").

  [3] Bowers later testified at the collateral evidentiary hearing that it did not even occur to him to object to the prayer because he thought it harmless.

> **[THE STATE]**: Okay.  The prayer by Reverend Langford was neutral, wasn't it?
> **[BOWERS]**: I've read the prayer from the motion, I didn't—I didn't think nothing of the prayer.
> **[THE STATE]**: Right.  It didn't to you seem to encourage anybody to convict this defendant or to acquit him, either way, did it?
> **[BOWERS]**: The prayer itself, no.
> **[THE STATE]**: Just kind of asked for the Lord's guidance in making a wise decision, something about like that?
> **[BOWERS]**: It speaks for itself, yes.

Postconviction Record, Vol. III at 353.

**[THE STATE]**:  Was it usual procedure for you and her to have lunch during the week?

**[HUSBAND]**:  Yes, we usually would meet at home.

**[THE STATE]**:  What was her normal lunch hour?

**[HUSBAND]**:  Between 12 and 1 each day.

**[THE STATE]**:  When was the last time you saw her?

**[HUSBAND]**:  June 17th, at First Baptist Church before they closed the coffin.

**[THE STATE]**:  This was at the funeral services?

**[HUSBAND]**:  Yes, at the funeral services.

**[THE STATE]**:  On June 14th, 1982, was Renee an employee of Jim Dickerson?

**[HUSBAND]**:  Correct.

**[THE STATE]**:  What is the name of his organization?

**[HUSBAND]**:  He represents State Farm Insurance Agency, Jim Dickerson, State Farm Insurance Agency.

**[THE STATE]**:  And where is it located?

**[HUSBAND]**:  On Highway 77.

**[THE STATE]**:  And that is in Bay County, Florida?

**[HUSBAND]**:  Correct.

**[THE STATE]**:  How many employees did Mr. Dickerson have?

**[HUSBAND]**:  One.

**[THE STATE]**:  And that was Renee?

**[HUSBAND]**:  And that was Renee.

Trial Record, Vol. I. at 291–93 (Jan. 18, 1983).

Somewhere in this testimony, Judge Wilson claims God was inserted into trial on the victim's side, but we don't see it.  Instead, we see the prosecutor establishing the husband as a fact witness and asking him about the day of the crime.  The prosecutor asked the husband about his last contact with his wife, and the husband took that question very literally and said that he last "saw" his wife in a coffin.  The prosecutor clarified that the husband was talking about the funeral, and then rerouted the questioning back to the circumstances of the crime.  And the

22

husband had a great deal to say about that: He had lunch with his wife a mere half hour before her murder; he knew about her work schedule and her habits; he knew what clothes she had worn that day; and most importantly, he could identify her wedding ring, which had been (according to the coroner) violently wrenched from her hand while she lay bleeding to death in the woods behind her office, and which Bates had been carrying in his pocket when the police saw him emerge from the woods just minutes after the murder.  All told, two things jump out from this testimony.  The first is that the prosecutor was not trying to elicit the victim's church affiliation, and he certainly did not dwell on it; he had other points to make.  The second is that, considering everything else that was going on in the husband's testimony, the one throwaway reference to the funeral was probably the detail least likely to engage the jury's attention.

The other point worth making here is how little textual support the transcript offers for Judge Wilson's claim that "this sequence of events focused the jury on the need for justice for the victim" because "[w]ithout a guilty verdict, the jury could do nothing for the God-fearing victim or her grieving husband."  Wilson, J., Op. at 1–2.  Nobody said anything even remotely like that at trial.  Neither the husband nor the prosecutor mentioned Reverend Langford or the pretrial prayer, and the husband's singular offhand mention of First Baptist Church does not appear ever again in the transcript.  There was no mention of God or "the need for

23

justice for the victim." We think, instead, that the husband's testimony is what it appears to be: a factual statement, made in passing, in response to one question asked in the course of a three-day trial. Most likely, the jury didn't think about it at all. Certainly there's no direct evidence that they did. And so, attempting to show unfairness, both Bates and Judge Wilson go far beyond the record.

2.

Bates, delving deep between the lines, asserts that the husband's testimony "was specifically elicited by the prosecution to make that connection between Reverend Langford of the First Baptist Church and [the victim]," Pet'r's Br. at 31, but he offers no evidence for that extraordinary claim apart from the transcript itself, which does not even circumstantially support his conspiracy theory. Even apart from that lack of evidence, Bates's suspicions are implausible. For one thing, if the prosecution was really devious enough to "plant" the husband's testimony, surely they would have made better use of it, either by lingering over the First Baptist connection on direct examination or by referencing the church or the testimony later in closing argument. Otherwise, this supposed "strategy" would be so subtle as to be self-defeating. Consider what this gambit would require of the jury: that (1) the preternaturally alert jurors zero in on the husband's offhand mention of the church, (2) instantly connect that to the Reverend's prayer the day before, (3) know, or at least suspect, that the husband and the Reverend were

24

members of the <u>same</u> First Baptist Church,[4] and (4) take all of that—somehow—as an invitation to ignore their oaths as jurors and find Bates guilty regardless of the evidence against him.  If that was really the plan, the prosecution was playing a very long game, indeed.

Judge Wilson, for his part, takes the position that those connections are not so implausible once you account for what he calls "the context of a racially charged environment."  Wilson, J., Op. at 2 n. 1; <u>see also</u> Pet. for Habeas Corpus, Doc. 1, at 55 ("Mr. Bates is black while the victim, and her minister who gave the invocation, and the entire guilt phase jury were white.").  On this account, the courtroom's ambient racial tension is the missing link that explains how a facially neutral prayer could fuse with a picayune detail from the husband's testimony to prejudice a defendant in a "high profile, racially charged murder case in a small community."  Wilson, J., Op. at 4.  But this dog-whistle theory[5] of prejudice is just as speculative as Bates's prosecutorial-conspiracy theory, and we don't know why

---

[4]  Today, there are at least four churches in Panama City, Florida, that call themselves First Baptist Church.  <u>See</u> ChurchSearch, Southern Baptist Convention, http://www.sbc.net/churchsearch/results.asp?query=Panama+City%2C+FL (last visited Aug. 4, 2014).  That number was probably different in 1983, when Bates was on trial, but we don't know.  And that is part of the problem: even if we assume, as the parties do, that Reverend Langford and the husband were talking about the same First Baptist Church, Bates never explains how the <u>jurors</u> would have known that.  Even Bowers—who was from the area and familiar with its churches—wasn't sure when asked about it years later at the collateral hearing.  <u>See</u> Postconviction Record, Vol. III at 374.  ("I didn't know [at the time that] the deceased— well, I still don't know, but I presume, was a member of that church.") (emphasis added).

[5]  <u>See</u> William Safire, <u>Safire's Political Dictionary</u> 190 (Oxford University Press 2008) (defining "dog-whistle politics" as "[t]he use of messages embedded in speeches that seem innocent to a general audience but resonate with a specific public attuned to receive them.").

25

Judge Wilson is so confident in asserting it; he wasn't in the courtroom.  Bowers, the lawyer, was in the room, and was familiar with Panama City, its churches, and its people.  And, "[u]nlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge."  Harrington v. Richter, __ U.S. __, 131 S. Ct. 770, 788, 178 L. Ed. 2d 624 (2011).  Bowers was, in other words, better positioned than any of us to evaluate what effect the husband's testimony might have in the moment, and he did not see any reason to object.[6]  The language about "racial tension" comes from testimony Bowers gave seven years later, at the collateral hearing, with the encouragement of Bates's new collateral counsel. Judge Wilson says "Bowers testified that the jurors could have drawn a prejudicial conclusion" from the husband's testimony, Wilson, J., Op. at 4 n. 2, and indeed that is exactly what Bowers said: they could have, a possibility that Bowers also described, in the same answer, as "pure speculation."  Here is that exchange:

> **[COUNSEL FOR PETITIONER]**:  Now, [the State] asked you certain questions about the prayer that was said in court.  And you've indicated you could relay what the impact of the prayer was on the jury.  I don't think he let you answer that.  Let me let you answer that.  From your perspective at the time, what was the impact of the jury hearing that from the victim's minister?

---

[6] Nor was Bowers simply asleep at the switch.  The transcript shows him objecting to testimony—for lack of relevance—just a few pages later.  See Trial Record, Vol. I. at 300 (Jan. 18, 1983).

26

**[BOWERS]**:  All right, at that time I didn't know the deceased—well, I still don't know, but I presume, was a member of that church. It's a prominent church in this area, one of the largest Baptist churches in this area.  Nothing that the minister might have said or intended, but a person sitting on the jury may have assumed—this is pure speculation—connected these things together.  And given a situation where you do have a racial tension type thing, it could produce a result.  Negative, prejudicial.

Postconviction Record, Vol. III at 374–75.

"Pure speculation" does not establish a due process violation.  There is no question that under the Constitution "a defendant has the right to an impartial jury that can view him without racial animus, which has so long distorted our system of criminal justice."  Georgia v. McCollum, 505 U.S. 42, 58, 112 S. Ct. 2348, 2358, 120 L. Ed. 33 (1992).  But it is equally well established that courts may not entertain "the divisive assumption—as a per se rule—that justice in a court of law may turn upon the pigmentation of skin, the accident of birth, or the choice of religion."  Id. at 59, 112 S. Ct. at 2359.  The record simply does not support the claim that God was injected into the trial on the victim's side, and we cannot fill in the gaps with the "divisive assumption" that jurors convicted Bates on account of his race, as opposed to the evidence presented against him—evidence that even Bates seems to concede was overwhelming.  See Pet. for Writ of Habeas Corpus, Doc. 1, at 30–36 ("[Part] C. Understanding the Offense").

27

Bates, of course, is not making a due process claim. The claim, instead, is that he received ineffective assistance of counsel when his lawyer did not make the due process objection on his behalf at trial. Specifically, the claim is that a competent lawyer watching events unfold at trial would have, at some point, moved for a mistrial. We disagree.

## D.

When a petitioner says his attorney was ineffective for failing to make an objection, Strickland requires proof that the attorney fell below the standard of "reasonableness under prevailing professional norms." Strickland, 466 U.S. at 688, 104 S. Ct. at 2065. This test "has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial." Waters v. Thomas, 46 F.3d 1506, 1512 (11th Cir. 1995) (en banc).

Decisions about whether to object—and when, and in what form—are tactical choices consigned by Strickland to a lawyer's reasoned professional judgment. Good lawyers, knowing that judges and juries have limited time and limited patience, serve their clients best when they are judicious in making objections. In any trial, a lawyer will leave some objections on the table. Some of those objections might even be meritorious, but the competent lawyer nonetheless

28

leaves them unmade because he considers them distractive or incompatible with his trial strategy.

In this case, as with any Strickland claim, we start by "reconstruct[ing] the circumstances of counsel's challenged conduct" and "evaluat[ing] the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689, 104 S. Ct. at 2065. We imagine Bowers, the defense lawyer, sitting in the courtroom and watching the victim's husband testify about the day of his wife's murder. During this testimony, the husband mentions that her funeral took place at First Baptist Church, and Bowers recalls that one day earlier Reverend Langford—also of First Baptist Church, or at least a First Baptist Church—had delivered a prayer at the start of jury selection. What should Bowers do?

We must assume, for the sake of argument, that in this hypothetical Bowers shares Judge Wilson's intuition about the possibility of prejudice on these facts. In real life, of course, it never even occurred to Bowers to object, first because it was not obvious to him (and, therefore, probably not obvious to the jury) that the husband was talking about the same church the Reverend belonged to—indeed, that still is not obvious, even today—and second because Bowers thought "nothing of the prayer" in the first place.[7] But let us proceed on the assumption that a

---

[7] Judge Wilson says the fact that Bowers "never even considered moving for a mistrial is all the more reason to believe that his failure to object was incompetent and not the product of thoughtful consideration," Wilson, J., Op. at 7–8, but we think that argument is obviously

competent attorney would at least think <u>something</u> of the prayer.  In considering

his options, Bowers would keep two additional points in mind.  First, a mistrial is

an extraordinary remedy—available only when a trial has broken down so

completely as to be wholly unreliable—and judges are (rightly) reluctant to use it.

A competent lawyer knows, therefore, that if he's going to move for a mistrial, he

needs a good reason, lest he waste time, lose credibility, and undermine his client

by making half-baked arguments.  Second, Bowers is not aware of any case that

might support his motion for a mistrial, even tangentially.  That assumption might

sound extreme, but we believe it to be fair because neither Judge Wilson nor Bates

cite any cases to support a mistrial motion, and if they cannot produce authority to

support their position—despite having time to consider and research the

question—it hardly seems fair to expect a trial attorney to develop the argument

wholesale on the spot.  Judge Wilson, on this point, says only that he "believe[s]

that many trial judges in Florida would grant a motion for a mistrial" on these

facts.  Wilson, J., Op. at 5 n.3.  That might be true; we have no idea.  What we do

know is that isn't the standard for <u>Strickland</u> performance.  That some judge,

somewhere in Florida, might buy an argument does not mean that all lawyers in all

---

circular: a competent attorney would object, Judge Wilson says, and this attorney did not object, so he must have been incompetent.  The conclusion is just a restatement of the premise.

30

cases <u>must</u> make that argument.  With those limitations in mind, Bowers would think through his options.

He could do the dramatic thing and rise to make a speaking objection, but that might be unwise.  For one thing, he would be interrupting a grieving husband's recollection of his wife's murder—which is no way to win friends on the jury—and for another, he would be calling attention to the very thing he wants to suppress: the victim's church affiliation.  If the jurors had not made the connection before between Reverend Langford and the husband's reference to First Baptist Church, they would certainly make that connection now, with Bowers spelling it out for them in his objection.  Objecting might make things worse by highlighting what would have otherwise been an entirely unremarkable and unmemorable detail.[8]

Judge Wilson, anticipating this argument, "agree[s] with [me] that interrupting either the prayer or the husband's testimony with an immediate

_____

[8]  This, of course, is a problem inherent to objections: in articulating the objection, the lawyer must underscore the substance of the thing he seeks to correct.  There is always the risk that the lawyer will object unsuccessfully and, in the process, only emphasize damaging testimony or evidence.  In deciding whether to object, then, lawyers are always making a calculation, weighing the importance of the objection against the risk of failure.  Those calculations almost never yield an objectively "correct" answer, which is why <u>Strickland</u> defers to the considered professional judgment of licensed attorneys.  <u>See</u> <u>Strickland v. Washington</u>, 466 U.S. 668, 693, 104 S. Ct. 2052, 2067, 80 L. Ed. 2d 674 (1984) ("Representation is an art, and an act or omission that is unprofessional in one case may be sound or even brilliant in another."); <u>Chandler v. United States</u>, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc) ("Different lawyers have different gifts; this fact, as well as differing circumstances from case to case, means the range of what might be a reasonable approach at trial must be broad.  To state the obvious: the trial lawyers, in every case, could have done something more or something different.").

31

objection would have been imprudent," but he suggests that the objection might come "after the husband's testimony concluded." Wilson, J., Op. at 4–5. But wait a minute: we thought the whole point of objecting was that the husband's testimony caused "obvious and significant prejudice" to Bates, and that Bowers "sat idly by as the prosecution stacked the deck against his client" and ignored "the jury's mounting prejudice against him." Id. at 6, 8. If the testimony was really that bad—if it had so undermined the fairness of the proceedings that only the extraordinary remedy of a mistrial would do—then how can Bowers afford to wait?

In fact, delaying the objection involves a whole new set of tactical problems. The first is the contemporaneous-objection rule, which "enforce[s] the requirement that parties lodge timely objections to errors at trial so as to provide the [trial] court with an opportunity to avoid or correct any error, and thus avoid the costs of reversal and a retrial." United States v. Turner, 474 F.3d 1265, 1275 (11th Cir. 2007). If Bowers waits too long to object, the trial judge can overrule the objection as untimely, and "where . . . a defendant fails to preserve an evidentiary ruling by contemporaneously objecting, [appellate] review is only for plain error." Id.

Not to worry, Judge Wilson says: the contemporaneous-objection rule is not so rigid that it prevents Bowers from waiting a little while—perhaps until a "natural breaking point" in the proceedings—to lodge his objection, "particularly if

32

counsel explains the reason for any delay." Wilson, J., Op. at 5. Maybe, but then again, maybe not: trial judges have a lot of discretion in ruling a belated objection untimely, and if Bowers sits on his objection until the close of the husband's testimony, the trial judge can—and very likely will—call it untimely, a decision our court would then only review for plain error. Turner, 474 F.3d at 1275. In deciding the timeliness of Bowers's objection, the trial judge will doubtlessly wonder about the delay: "Hold on," he might ask, "you're telling me, on the one hand, that this testimony was so disastrously prejudicial to your client that it makes the whole trial irreparably unfair, but you're only bringing it to my attention now, after the witness was excused?" The judge might assume that Bowers is not all that serious, after all, in his objection, or that Bowers merely wants to preserve the issue for appeal, or that Bowers is "sandbagging the court—remaining silent about his objection and belatedly raising the error only if the case does not conclude in his favor." Cf. Puckett v. United States, 556 U.S. 129, 134, 129 S. Ct. 1423, 1428, 173 L. Ed. 2d 266 (2009) (quotation marks omitted). No doubt the trial judge might agree with Judge Wilson and say that Bowers's reason for waiting was a good one, but Bowers, sitting at counsel's table, has no way of knowing that. From his perspective, an objection presents an inescapable dilemma: he can either object immediately—which ensures that his objection is timely, but also requires him to interrupt the husband's testimony—or he can wait and try to object later,

33

which avoids some of the practical problems of an immediate objection, but risks losing the argument entirely to the contemporaneous-objection rule. Or he might decide that it isn't worth objecting at all.

We want to be clear: our point is not that it would be wrong for Bowers to object. Our point is only that the answer is not obvious. Reasonable lawyers could disagree about the best way forward. On habeas review, we need only reiterate that "it does not follow that any counsel who takes an approach we would not have chosen is guilty of rendering ineffective assistance." Waters, 46 F.3d at 1522. Bowers, in this hypothetical, faces a choice where his conduct is "neither directly prohibited by law nor directly required by law," which is to say: the choice is strategic, and "a court must not second-guess counsel's strategy." Chandler, 218 F.3d at 1314 n.14.

Judge Wilson's wait-and-see approach also depends on "the distorting effects of hindsight," contra Strickland, 466 U.S. at 689, 104 S. Ct. at 2065, as it is only in retrospect that we know Bowers could have safely waited until the conclusion of the husband's testimony. Bowers, sitting in the courtroom and watching events unfold in real time, does not have that luxury because he does not know what the prosecutor's next question will be. For all he knows, the worst is yet to come—and if things had gotten worse, and if Bowers had adopted Judge Wilson's wait-and-see strategy, we do not doubt that Bates would now be before

34

our court to complain of ineffective assistance because his attorney waited too long to object. Habeas lawyers can play this game all day—and they do. See Waters, 46 F.3d at 1514 ("The widespread use of the tactic of attacking trial counsel by showing what 'might have been' proves that nothing is clearer than hindsight— except perhaps the rule that we will not judge trial counsel's performance through hindsight.").

Even putting aside the practical problems with moving for a mistrial, our hypothetical defense attorney would also consider the substance of his objection before proceeding, and consider how likely he is to prevail. Let's imagine that Bowers waits and finds an opportune time to approach the bench and move for a mistrial outside the presence of the jury. We suppose, in some parallel universe, that he might get lucky and secure a mistrial then and there, but we doubt it very much: the Reverend's prayer was generic, the husband's reference to church was made in passing, and Bowers can cite no authority, from any jurisdiction, to convince the judge that the husband's testimony requires the extraordinary remedy of a mistrial. If the judge is feeling generous he might offer to give the jury a curative instruction of some kind, but for Bowers that would be the worst of both worlds. His entire concern is that the jury will link the Reverend to the victim, and a curative instruction will accomplish that more definitively than anything the jury has already heard. And so, having failed to get a mistrial and having declined the

35

judge's offer of a curative instruction, Bowers returns to counsel's table empty-handed, and the prosecutor resumes his direct examination of witnesses in front of an even-more bewildered jury.  A competent attorney could reasonably decide that this whole gambit would be fruitless, and possibly counterproductive.

Judge Wilson's answer to this is that Bowers had nothing to lose: "[A]t worst, Bowers faced a win-no lose situation.  Had he raised the objection, he might have secured a mistrial and spared his client from prejudice, but at worst, his objection would have been overruled."  Wilson, J., Op. at 6.  Judge Wilson does not cite a single case to support this "win-no lose situation" test of Strickland performance, which—if it were the law—would require defense lawyers to make themselves perpetual objection machines, lest some later reviewing court identify a conceivably plausible objection that counsel failed to raise.  Fortunately, Judge Wilson's position is not the law: "[The Supreme] Court has never established anything akin to the Court of Appeals' 'nothing to lose' standard for evaluating Strickland claims."  Knowles v. Mirzayance, 556 U.S. 111, 122, 129 S. Ct. 1411, 1419, 173 L. Ed. 2d 251 (2009); see also Chandler v. United States, 218 F.3d 1305, 1319 (11th Cir. 2000) (en banc) ("Counsel is not required to present every nonfrivolous defense . . . . Considering the realities of the courtroom, more is not always better.  Stacking defenses can hurt a case.  Good advocacy requires

'winnowing out' some arguments, witnesses, evidence, and so on, to stress others.").

Judge Wilson also says that a lawyer's fear of being overruled cannot excuse an attorney's decision to forego "the best arguments [he] can make" on his client's behalf. But, first of all, the Strickland test "has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We ask only whether some reasonable lawyer could have acted, in the circumstances, as defense counsel acted at trial." Waters, 46 F.3d at 1512 (citations omitted); see also LeCroy v. United States, 739 F.3d 1297, 1313 (11th Cir. 2014) ("We do not measure counsel against what we imagine some hypothetical 'best' lawyer would do."). Second, Judge Wilson never substantiates the assumption behind this claim, which is that an objection here really is the "best" argument Bowers could make under the circumstances. Neither Bates nor Judge Wilson cites cases to support a hypothetical mistrial motion, nor do they even articulate what, exactly, Bowers is supposed to say when it comes time to object. We thus have no basis on which to say that objecting would be the "best" argument; we can only say, at most, that it might be one argument, and a long shot at that. See Knowles, 556 U.S. at 125, 129 S. Ct. at 1421 (concluding that attorneys are not required to raise a defense that is "almost certain to lose."); Diaz

37

v. Sec'y for the Dep't of Corr., 402 F.3d 1136, 1142 (11th Cir. 2006) (concluding

that a lawyer "is not ineffective for failure to raise a meritless argument.").

All of this brings us back, one last time, to Bowers sitting in the courtroom

and listening to the husband's testimony.  With the contemporaneous-objection

clock ticking, and mindful of the wisdom of objecting judiciously, he must decide

whether to interrupt the proceedings and object so he can roll the dice on a long-

shot mistrial motion, for which he can cite no legal authority, that might end up

backfiring by highlighting testimony the jury might have otherwise ignored

completely.  Can we imagine that there is "some reasonable lawyer" out there,

somewhere, who would survey this situation and decide, as Bowers did, to stay

seated?  Waters, 46 F.3d at 1512.  We say, with gusto, that we can.  There is not a

"right" answer here that all attorneys must follow in all cases.  In every trial,

attorneys have to make hundreds of tiny ambiguous decisions like this one, where

they must decide to act or react or not act at a moment's notice in circumstances

where their legal position is uncertain.  Bolender v. Singletary, 16 F.3d 1547, 1557

(11th Cir. 1994) ("[T]he craft of trying cases is far from an exact science; in fact, it

is replete with uncertainties and obligatory judgment calls.").  Any one of those

decisions could later be pinned beneath the appellate microscope, dissected, and

made to look foolish by collateral counsel, who—unlike trial attorneys—have

years and sometimes decades to craft dazzling new theories of defense.  But the

trial lawyer has to play the hand he's dealt in circumstances that are inevitably not ideal; money, time, and energy are finite, and sometimes the facts or law or both are stacked against him. Our task is "not to grade counsel's performance," Strickland, 466 U.S. at 697, 104 S. Ct. at 2069, or ask whether the attorney could have performed better, or ask whether some novel, unenacted strategy might have led to a better outcome for the client. Strickland speaks only to the small class of cases in which "counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment" at all, 466 U.S. at 687, 104 S. Ct. at 2064, and does not operate as a catch-all mechanism for "fixing" trials we might have conducted differently. See White v. Singletary, 972 F.2d 1218, 1221 (11th Cir. 1992) ("[W]e are interested in whether the adversarial process at trial, in fact, worked adequately."). The record in this case demonstrates that Bowers labored diligently to defend his client. He subjected the state's case to adversarial testing. And he lost in the face of overwhelming evidence that his client committed a terrible crime.[9] That is bad news for Bates, but it is not a Sixth Amendment violation.

---

[9] The overwhelming evidence of Bates's guilt also makes it obvious that Bates cannot show Strickland prejudice. Even if one assumes that Bowers was incompetent for failing to object to the husband's testimony, "[a]n error by counsel . . . does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." 466 U.S. at 691, 104 S. Ct. at 2066.

In evaluating whether an attorney's error had an effect on the judgment, the question is not whether the defendant could have temporarily evaded conviction by demanding a new trial. Rather, "[w]hen a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." Id. at 695, 104 S. Ct. at 2068–69 (emphasis added).

IV.

Bates also contends that his right to a fair capital sentence proceeding, as articulated in Simmons v. South Carolina, was violated at his 1995 resentencing by the trial court's refusal to instruct the jury either that:  (1) it could impose a sentence of life without the possibility of parole under the 1994 amendment to Fla. Stat. § 775.082; (2) he had agreed to waive parole eligibility under the pre-amendment version of that statute; or (3) he had already been sentenced to two life terms plus fifteen years on his other counts of conviction, all of which would run consecutively to any sentence he received for murder.  In support of this claim, Bates asserts that retroactively applying the 1994 version of § 775.082 to the murder he committed in 1982 would not violate the constitutional prohibition against ex post facto laws because it would not work to his disadvantage and he had otherwise agreed to waive any ex post facto rights.  Because he had agreed to waive his eligibility for parole under the pre-amendment version of § 775.082, Bates maintains that he was entitled under Simmons "to an accurate jury

---

Here, then, even if Bowers had objected, and even if he had gotten a new trial with a new jury, he would still have faced the huge body of inculpatory evidence offered by the State.  The police encountered Bates emerging from the woods just minutes after the murder, his clothes stained with the victim's blood.  They found the victim's wedding ring in his pocket.  Next to her body they found his knife case, and the victim's fatal stab wounds matched his knife.  The most likely outcome of a new trial would still be the same result: a guilty verdict.

40

instruction" that a sentence of life without the possibility of parole could be imposed in lieu of the death penalty.[10]

In Simmons, the Supreme Court held that "where the defendant's future dangerousness is at issue, and state law prohibits the defendant's release on parole, due process requires that the sentencing jury be informed that the defendant is parole ineligible."  512 U.S. at 156, 114 S.Ct. at 2190 (plurality opinion); see also

_____

[10] In his federal habeas petition, Bates raised a distinct claim that the resentencing court violated the principles of Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954 (1976), by preventing him from presenting various types of relevant mitigating evidence that "might serve as a basis for a sentence less than death," including the consecutive sentences he had received for his non-homicide convictions.  Although the COA we granted is broad enough to encompass that claim, at least insofar as it relies on evidence of Bates' other consecutive sentences, Bates has abandoned it by failing to "plainly and prominently" argue on appeal that the resentencing court was required under Lockett to admit evidence of his other consecutive sentences as relevant mitigating circumstances.  See Sapuppo v. Allstate Floridian Ins. Co., 739 F.3d 678, 681 (11th Cir. 2014) ("A party fails to adequately brief a claim when he does not plainly and prominently raise it, for instance by devoting a discrete section of his argument to those claims.") (quotation marks omitted); United States v. Willis, 649 F.3d 1248, 1254 (11th Cir. 2011) ("A party seeking to raise a claim or issue on appeal must plainly and prominently so indicate. . . . Where a party fails to abide by this simple requirement, he has waived his right to have the court consider that argument.") (quotation marks and citation omitted).  Bates did include a single citation to Lockett in his appellate brief, but that passing reference is not enough to preserve the issue for appellate review.  See Sapuppo, 739 F.3d at 681–82 (explaining that an "appellant abandons a claim when he either makes only passing references to it," "raises it in a perfunctory manner without supporting arguments and authority," or buries it within his main arguments).  And contrary to Judge Wilson's concurring opinion, the fact that Bates broadly contends that the state courts' refusal to admit such evidence was unconstitutional is not sufficient to place a Lockett-based claim before us.  Bates' claim centers on the constitutional rule announced in Simmons, not the one set forth in Lockett.  A petitioner who, for example, challenges the admission of evidence as violative of his constitutional rights under the Fourth Amendment cannot be said to have properly preserved any and all constitutional challenges to that evidence, whether based on the Fifth Amendment right against compelled self-incrimination or the Sixth Amendment right to confront adverse witnesses.

In any event, as we discuss later, the Supreme Court's decisions in Simmons and Ramdass v. Angelone, 530 U.S. 156, 120 S.Ct. 2113 (2002), which directly deal with evidence concerning parole ineligibility, provide enough basis for reasonably concluding that the admission of evidence of other consecutive sentences at a capital sentence hearing is not mandated by clearly established federal law.

id. at 178, 114 S.Ct. at 2201 (O'Connor, J., concurring) ("Where the State puts the defendant's future dangerousness in issue, and the only available alternative sentence to death is life imprisonment without the possibility of parole, due process entitles the defendant to inform the capital sentencing jury . . . that he is parole ineligible."). The basis of the Court's holding was that the State "may not mislead the jury [about the defendant's future dangerousness] by concealing accurate information about the defendant's parole ineligibility" under state law. Id. at 165 n.5, 114 S.Ct. at 2194 n.5 (plurality opinion). At the same time, however, the Court endorsed the general proposition that where "parole is available" as a matter of state law, courts should "defer to a State's determination as to what a jury should and should not be told about sentencing" because "how the jury's knowledge of parole availability will affect the decision whether or not to impose the death penalty is speculative." Id. at 168, 114 S.Ct. at 2196 (plurality opinion); see also id. at 176, 114 S.Ct. at 2200 (O'Connor, J., concurring) ("The decision whether or not to inform the jury of the possibility of early release is generally left to the States. In a State in which parole is available, the Constitution does not require (or preclude) jury consideration of that fact.") (citation omitted).

Since Simmons was decided, the Supreme Court has declined to extend its holding to cases where parole ineligibility has not been conclusively established as a matter of state law. See Ramdass v. Angelone, 530 U.S. 156, 165, 120 S.Ct.

42

2113, 2119 (2002) (plurality opinion). In Ramdass, the Court explained that the Simmons rule applies only "when a defendant is, as a matter of state law, parole ineligible at the time of his trial," and it refused to adopt a "functional approach" to parole ineligibility — one dependent on whether a defendant "would, at some point, be released from prison" — because that approach would require courts and juries to examine too many theoretical possibilities, which "might well" distract them "from the other vital issues in the case." Id. at 168–69, 120 S.Ct. at 2121.

The Florida Supreme Court rejected Bates' Simmons claim based on its interpretation of the 1994 amendment to Fla. Stat. § 775.082. The court held that the amended statue, which eliminated the possibility of parole for capital defendants sentenced to life in prison, "was not applicable to crimes committed before its effective date" of May 25, 1994, because state laws are "presumed to apply prospectively" in the absence of "clear legislative intent to the contrary," and there was "no unequivocal language that the Legislature intended this amendment to apply retroactively." Bates, 750 So. 2d at 10; see also State v. Smith, 547 So. 2d 613, 616 (Fla. 1989) ("[I]t is firmly established law that the statutes in effect at the time of commission of a crime control as to the offenses for which the perpetrator can be convicted, as well as the punishments which may be imposed."). From that threshold determination that "the 1994 amendment [could] have no effect on [Bates'] sentencing," the Florida Supreme Court concluded that there was simply

43

no ex post facto claim for Bates to waive and that he was not entitled to have the jury informed that he had agreed to waive parole eligibility because, "[a]t the time [he] committed this murder, the Legislature had not established life without the possibility of parole as punishment for this crime." Bates, 750 So. 2d at 10–11.

Turning to Bates' request that the jury be informed of his other consecutive sentences, the Florida Supreme Court explained that "[t]he introduction of this evidence would open the door to conjecture and speculation as to how much time a prisoner serves of a sentence and distract jurors from the relevant issue of what is the appropriate sentence for the murder conviction." Id. at 11. Because "[t]he length of actual prison time is affected by many factors other than the length of the sentence imposed by the sentencing court," the Florida Supreme Court found that evidence of Bates' other sentences was not relevant to the issue of whether he would "actually remain in prison for the length of those sentences." Id.

That decision was neither contrary to, nor an unreasonable application of, Simmons and its progeny. Simmons requires that a sentencing jury be informed of a defendant's parole ineligibility only where the defendant is, as a matter of state law, absolutely ineligible for parole and the State places his future dangerousness at issue. [11] See 512 U.S. at 156, 178, 114 S.Ct. at 2190, 2201; Ramdass, 530 U.S.

---

[11] In addressing a separate claim that the State had violated Hitchcock v. State, 673 So. 2d 859, 863 (Fla. 1996), by arguing to the jury that Bates would be eligible for parole on a life sentence after serving 25 years, the Florida Supreme Court noted that the State had not

44

at 166, 120 S.Ct. at 2120 ("[A] parole-ineligibility instruction is required only when, assuming the jury fixes the sentence at life, the defendant is ineligible for parole under state law."). The Florida Supreme Court's twin determinations — that the 1994 amendment to § 775.082 does not apply retroactively to Bates' criminal conduct and that he had no right under state law to waive his parole eligibility — conclusively establish that Bates would be eligible for parole if the jury sentenced him to life imprisonment. In light of the Florida Supreme Court's interpretation of state law, which is binding on federal courts, Bates was not entitled under Simmons to inform the jury that it could impose a sentence of life without the possibility of parole or that he had agreed to waive his parole eligibility. See Ramdass, 530 U.S. at 167, 120 S.Ct. at 2120 (holding that a Simmons instruction was not required in light of the Virginia Supreme Court's "authoritative determination" that the "petitioner was not ineligible for parole when the jury considered his sentence"); see also Estelle v. McGuire, 502 U.S. 62, 67–68, 112 S.Ct. 475, 480 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."); Mullaney

---

"inject[ed] [Bates'] future dangerousness into its evidence or argument." Bates, 750 So. 2d at 11. Without explicitly acknowledging that finding, Bates asserts that the State's cross-examination of his character witnesses and its closing argument "implied that [he] would be a danger in the future." We need not decide whether the Florida Supreme Court's contrary finding forecloses federal habeas relief on Bates' Simmons claim because the court did not specifically rely on that finding when rejecting the claim before us, and Bates would still not be entitled to relief under AEDPA even if we assume that the prosecution had put his future dangerousness at issue.

45

v. Wilbur, 421 U.S. 684, 691, 95 S.Ct. 1881, 1886 (1975) ("This Court . . . repeatedly has held that state courts are the ultimate expositors of state law and that we are bound by their constructions except in extreme circumstances.") (citation omitted); Reaves v. Sec'y, Fla. Dep't of Corr., 717 F.3d 886, 903 (11th Cir. 2013) ("The Florida Supreme Court's interpretation of state law is binding on federal courts.").

Bates insists that there was no ex post facto impediment to retroactively applying the amended version of § 775.082 to his pre-amendment criminal conduct because, under the circumstances of his case, it would not work to his disadvantage and he otherwise agreed to waive his ex post facto rights.  But that argument misses the point.  The Florida Supreme Court's conclusion that the revised sentencing statute does not apply retroactively to crimes committed before its effective date was not based on the constitutional prohibition against ex post facto legislation.  Instead, it was a matter of statutory construction based on the time-honored presumption against retroactive application of laws absent clear legislative intent to the contrary.  See Bates, 750 So. 2d at 10 ("Retroactive application of the law is generally disfavored . . . and any basis for retroactive application must be unequivocal and leave no doubt as to the legislative intent.") (citations omitted); see generally Landgraf v. USI Film Prods., 511 U.S. 244, 265, 114 S.Ct. 1483, 1497 (1994) ("[T]he presumption against retroactive legislation is deeply rooted in

46

our jurisprudence, and embodies a legal doctrine centuries older than our Republic.").

Because the amended Florida statute, as authoritatively interpreted by Florida's highest court, does not operate retroactively, there is no ex post facto problem for Bates to waive. Ex post facto problems can arise only if a law actually does apply retroactively to criminal conduct or other events that occurred before its enactment. See Lynce v. Mathis, 519 U.S. 433, 441, 117 S.Ct. 891, 896 (1997) ("To fall within the ex post facto prohibition, a law must be retrospective — that is, it must apply to events occurring before its enactment — and it must disadvantage the offender . . . by altering the definition of criminal conduct or increasing the punishment for the crime.") (quotation marks and citations omitted). Bates' problem was not one that he can waive his way around because his problem is that the state law he sought to have applied to him did not apply to him.

As for Bates' contention that the state courts violated his clearly established due process rights by failing to instruct the jury about his other consecutive sentences, we rejected a virtually identical argument in Booker v. Secretary, Florida Department of Corrections, 684 F.3d 1121 (11th Cir. 2012). There, the petitioner argued that the state trial court had violated his due process rights when it refused to instruct his capital sentencing jury that he "was serving a consecutive term of imprisonment of one-hundred years" for his other crimes, which

47

"functionally barred him from ever being paroled" if he were sentenced to life with the possibility of parole after 25 years on his murder conviction.  Id. at 1123–24. The Florida Supreme Court, quoting the earlier decision that it had issued in this case, rejected the petitioner's claim on the ground that "[t]he introduction of this evidence would open the door to conjecture and speculation as to how much time a prisoner serves of a sentence and distract jurors from the relevant issue of what is the appropriate sentence for the murder conviction."  Booker v. State, 773 So. 2d 1079, 1088 (Fla. 2000) (quoting Bates, 750 So. 2d at 11).

Applying AEDPA standards, we held that the Florida Supreme Court's decision in Booker was not contrary to or "an unreasonable application of clearly established federal law, which thus far has only addressed jury instructions in the circumstance of statutory parole ineligibility."  Id. at 1126.  We explained that "Simmons does not control where the defendant is statutorily eligible for release on parole," and that "Ramdass rejected the functional approach to parole eligibility that [the petitioner] urges us to adopt here."  Id.  Even if the state court's decision "violate[d] the spirit of Simmons," we concluded in Booker that it did not violate any clearly established Supreme Court precedent about "the necessity of an instruction to inform the jury of the length of a defendant's likely term of

48

imprisonment." Id. at 1126–27 (quotation marks and ellipsis omitted). Our

Booker decision forecloses Bates' claim.[12]

The need for AEDPA deference here is no different than it was in Booker.[13]

Indeed, there appears to be even more reason to defer to the Florida Supreme

Court's decision in this case because Bates, unlike the petitioner in Booker, cannot

colorably claim that his other consecutives sentences "functionally barred him

from ever being paroled."[14]  Id. at 1124.  At the time Bates was sentenced for his

non-homicide offenses, Florida law provided that he would be eligible for parole

---

[12] Judge Wilson's concurring opinion insists that our decision in Booker does not foreclose Bates' claim that he is entitled to federal habeas relief based on a violation of his due process rights under Simmons. But it does. The petitioner in Booker, like the petitioner here, asserted that "the state court violated his due process rights when it refused to instruct the jury regarding his other consecutive sentences." Booker, 684 F.3d at 1124. And we held that the petitioner was not entitled to federal habeas relief because the Florida Supreme Court's rejection of that claim was neither contrary to, nor an unreasonable application of, "Simmons or its progeny" or any other "clearly established federal law, which thus far has only addressed jury instructions in the circumstances of statutory parole ineligibility." Id. at 1126. Because there were no changes in clearly established federal law between the time the Florida Supreme Court decided Booker's appeal and the time it decided Bates' appeal, Bates' near-identical claim for federal habeas relief must also fail under AEDPA standards.

[13] Bates attempts to distinguish Booker and Ramdass on the ground that neither case involved a defendant who agreed to waive his right to parole eligibility. **[Bl.Br. at 60]**  But that is a distinction without a difference because the Florida Supreme Court has conclusively determined, as matter of state law, that Bates had no right to waive his parole eligibility and effectively opt for a sentence that was not authorized by the law in effect at the time he committed first-degree murder. Bates has not cited any Supreme Court precedent holding that states must permit a defendant to waive a state law applicable to his sentencing simply because it would be advantageous for him to do so.

[14] Unlike Bates' consecutive sentences, all of which carried the possibility of parole, there is no indication from the face of our opinion in Booker that the petitioner in that case was eligible for parole on his consecutive term of 100 years imprisonment. Indeed, in Booker we assumed that the petitioner would have to satisfy "his multiple terms of incarceration" before becoming eligible for parole on a possible life sentence for his murder conviction. 684 F.3d at 1122 & n.1.

on his two life sentences "within 5 years after the initial date of confinement in execution of the judgment," and would be eligible for parole on his remaining fifteen-year sentence "within 24 months" of that same date. See Fla. Stat. § 947.16(1)(c)-(d) (1983). Had the resentencing jury fixed Bates' sentence for first-degree murder at life, it appears that he would have been eligible for parole on all of his convictions within 37 years of his initial 1983 confinement or 25 years after his 1995 resentencing proceeding. See id. § 947.16(2)(g) ("For purposes of determining eligibility for parole interview and release, . . . [e]ach mandatory minimum portion of consecutive sentences shall be served consecutively.").

Because parole was still a legal possibility, however remote and however far removed, at the time of Bates' resentencing proceeding, his circumstances fell outside the narrow confines of Simmons' constitutional rule, which applies only when lifetime parole ineligibility is a certainty under state law. See Simmons, 512 U.S. at 171, 114 S.Ct. at 2198 (plurality opinion) ("The State may not create a false dilemma by advancing generalized arguments regarding the defendant's future dangerousness while, at the same time, preventing the jury from learning that the defendant never will be released on parole.") (emphasis added); Ramdass, 530 U.S. at 181, 120 S.Ct. at 2127–28 (O'Connor, J., concurring) ("Simmons does not require courts to estimate the likelihood of future contingencies concerning the defendant's parole ineligibility. Rather, Simmons entitles the defendant to inform

the capital sentencing jury that he is parole ineligible where the <u>only alternative</u> <u>sentence to death is life without the possibility of parole</u>.") (emphasis added).  The Florida courts had leeway in deciding whether the jury should be informed of Bates' other consecutive sentences, none of which guaranteed that he would never be released from prison if he were given a life sentence for first-degree murder. See <u>Simmons</u>, 512 U.S. at 168, 114 S.Ct. at 2196 (plurality opinion) ("[W]e generally will defer to a State's determination as to what a jury should and should not be told about sentencing.  In a State in which parole is available, how the jury's knowledge of parole availability will affect the decision whether or not to impose the death penalty is speculative, and we shall not lightly second-guess a decision whether or not to inform a jury of information regarding parole."); <u>id.</u> at 176, 114 S.Ct. at 2200 (O'Connor, J., concurring) ("In a State in which parole is available, the Constitution does not require (or preclude) jury consideration of that fact.").

As the Supreme Court explained in <u>Ramdass</u>, a "functional approach" to parole ineligibility is neither "necessary [n]or workable" because "[t]he possibilities [of when a defendant might be released from prison] are many, the certainties few," and states "might well conclude that the jury would be distracted from the other vital issues in the case."  530 U.S. at 169, 120 S.Ct. at 2121 (plurality opinion).  Although it acknowledged that the "latitude" given to states in this area is subject to "federal requirements . . . related to the admission of

51

mitigating evidence," the Ramdass Court underscored that states could, for a variety of reasons, reasonably conclude that information concerning potential parole ineligibility might not be material:

> Parole eligibility may be unrelated to the circumstances of the crime the jury is considering or the character of the defendant, except in an indirect way. Evidence of potential parole ineligibility is of uncertain materiality, as it can be overcome if a jury concludes that even if the defendant might not be paroled, he may escape to murder again; he may be pardoned; he may benefit from a change in parole laws; some other change in the law might operate to invalidate a conviction once thought beyond review; or he may be no less a risk to society in prison. The Virginia Supreme Court had good reason not to extend Simmons beyond the circumstances of that case, which included conclusive proof of parole ineligibility under state law at the time of sentencing.

Id. at 169–70, 120 S.Ct. at 2121–22 (citations omitted).[15]

The Florida Supreme Court expressed similar concerns when it concluded that Bates' non-homicide sentences were "not relevant mitigation on the issue of whether [he] will actually remain in prison for the length of those sentences" and "would open the door to conjecture and speculation" because the "length of actual prison time is affected by many factors other than the length of the sentence imposed by the sentencing court." Bates, 750 So. 2d at 11. That court, too, "had

---

[15] In his concurring opinion, Judge Wilson expresses his belief that the Supreme Court would, if given the chance, likely "conclude that due process requires [the admission of other consecutive sentences as] relevant mitigation evidence in a capital sentencing." That belief flies in the face of the fact that the Court has already rejected a "functional approach" to parole ineligibility and given several reasons why "[e]vidence of potential parole ineligibility is of uncertain materiality." See Ramdass, 530 U.S. at 169–70, 120 S.Ct. at 2121–22. We have no reason to believe that the Supreme Court will rule to the contrary in the future. And, as Judge Wilson acknowledges, under AEDPA only past holdings count; future ones are irrelevant.

good reason not to extend <u>Simmons</u> beyond the circumstances of that case, which included conclusive proof of parole ineligibility under state law at the time of sentencing." See <u>Ramdass</u>, 530 U.S. at 170, 120 S.Ct. at 2121 (plurality opinion). We cannot say that the state courts' refusal to allow Bates to inform the jury of his other consecutive sentences, all of which carried the possibility of parole at some point, was contrary to or an unreasonable application of clearly established Supreme Court precedent. At the very least, some fairminded jurists could conclude that the Florida Supreme Court's decision was not "so lacking in justification that there was an error well understood and comprehended in existing law," which forecloses Bates' entitlement to federal habeas relief under AEDPA's highly deferential standards. See <u>Harrington</u>, 131 S.Ct. at 786–87.

V.

For these reasons, we affirm the district court's denial of Bates' § 2254 petition for a writ of habeas corpus.

**AFFIRMED.**

WILSON, Circuit Judge, concurring:

Although I ultimately agree that Bates is not entitled to habeas relief on his claims, I write separately to emphasize my disagreement with much of the Majority's analysis. First, with respect to Bates's ineffective assistance of counsel claim, although I believe that trial counsel was ineffective, given the dearth of clearly established law on this point, I agree that the state court's adjudication was not an unreasonable application of clearly established federal law. Similarly, with respect to Bates's claim involving the resentencing jury's lack of awareness about his consecutive life sentences, I disagree with the Majority's conclusion that existing Supreme Court precedent forecloses his claim. Nevertheless, because I agree that the Florida Supreme Court's adjudication was not contrary to clearly established law of the Supreme Court, I ultimately concur in the outcome of that claim.

## A.

Bates's murder trial began with a prayer in the presence of the jury, and the victim's husband subsequently gave testimony informing the jury that the prayer was delivered by none other than the victim's own minister. This testimony had no probative value, but it had great potential to prejudice the jury against Bates. The prayer inserted God into Bates's trial, and the husband's testimony made clear whose side God was on.

54

Bates argues that his trial counsel, Bowers, rendered ineffective assistance by failing to object to this highly prejudicial sequence of events, either when the trial judge asked the victim's minister to pray or when the victim's husband's testimony linked the victim to the minister's church.  Specifically, Bates insists that in the racially charged context of this case, where a black defendant stood before an all-white jury, beginning the trial with a prayer by the victim's minister was not generic and benign as the district court and the Majority concludes, particularly after the jury became aware of who delivered the prayer.  Moreover, Bates insists that the Florida Supreme Court did not conduct the proper cumulative *Strickland* prejudice analysis because it failed to consider the totality of the circumstances within the context of Bates's trial.[1]

The Florida Supreme Court concluded that this *Strickland* claim failed on the merits.  *See Bates v. Dugger*, 604 So. 2d 457, 459 n.4 (Fla. 1992).  Although

---

[1] Part of Bates's theory may be, as the Majority says, "that an all-white jury cannot give a black defendant charged with the murder of a white woman a fair trial."  Maj. Op. at 14.  Had Bowers secured a mistrial by requesting one after the prayer or at least after the husband's testimony, Bates believes he may have benefitted from a racially diverse jury.  That, however, is not Bates's only argument, or his best one.  To be perfectly clear, I am focusing here on Bates's claim that in the context of a racially charged environment, which included an all-white jury, a white Christian victim whose religion was made evident by her minister's prayer, and a black defendant, *his counsel's failure to object* to the minister's prayer after the husband's testimony was objectively unreasonable.  The prejudice Bates suffered as a result of this unobjected-to sequence of events was not facing an all-white jury, which perhaps may have been able to give Bates a fair trial *before* they listened to the minister's opening prayer.  Rather, Bates claims, and I agree, that the jury was far less likely to be able to give Bates a fair trial *after* the prayer and the husband's testimony, and that any competent counsel would have objected.  This testimony linked the minister's plea for God's guidance to the victim herself, turning a potentially innocuous prayer into a not so subtle reminder that Bates stood accused of murdering a Christian woman and that her minister was interested in the trial.

55

Bates insists that the Florida Supreme Court's determination is not entitled to

AEDPA deference because it was insufficient and relied upon inaccurate facts, the

Supreme Court has clarified that "[w]here a state court's decision is

unaccompanied by an explanation, the habeas petitioner's burden still must be met

by showing there was no reasonable basis for the state court to deny relief."

*Harrington v. Richter*, __ U.S. __, 131 S. Ct. 770, 784 (2011); *see Jones v. GDCP*

*Warden*, __F.3d __, 2014 WL 1088312, *10 (11th Cir. March 20, 2014) ("AEDPA

mandates deferential review of any claim that a state court 'adjudicated on the

merits,' 28 U.S.C. § 2254(d), and does not impose any specific requirements on

how a state court should announce its decision.").  Therefore, we owe the Florida

Supreme Court's rejection of Bates's ineffective assistance of counsel claim

AEDPA deference, and given that conclusion, I agree with the Majority that Bates

is not entitled to habeas relief.  I am not aware of any clearly established federal

law, nor has Bates cited any, which indicates that the Florida Supreme Court's

determination is an unreasonable determination under *Strickland*.

This is not to say that I agree with the Florida Supreme Court's decision.  I

do not.  I concur and do not dissent only because that court's decision is not

necessarily an unreasonable one.  Unlike the Majority and that court, however, I

believe that Bates has presented a persuasive *Strickland* claim.  One would expect

reasonably competent counsel, following a prayer by a murder victim's minister

56

and subsequent testimony linking the victim to the minister's church, to request permission to approach the bench, to object, and to ask for a mistrial. This is especially true given the context of Bates's original trial: it was a high profile, racially charged murder case in a small community.[2]

I agree with the Majority that interrupting either the prayer or the husband's testimony with an immediate objection would have been imprudent. I also agree that if Bowers had waited too long to object, his objection would have been barred by the contemporaneous-objection rule. *See, e.g.*, *United States v. Turner*, 474 F.3d 1265, 1267 (11th Cir. 2007) (refusing to consider an objection to testimony where the "objection was made by defense counsel *only the next day*" (emphasis added)). I disagree, however, that competent counsel would not find an opportunity to object in the rather large window of time between the moment the husband gave the objectionable testimony (when an objection would have been imprudent) and "the next day" (when an objection would have been untimely). Had Bowers asked to approach the bench immediately after the husband's testimony concluded but before the next witness was called, the objection would

---

[2] During the postconviction evidentiary hearing, Bowers testified that the jurors could have drawn a prejudicial conclusion from the prayer and subsequent testimony given the racial tension in the case. In his brief, Bates explains that "[n]o black defendant in a death penalty case in Panama City had ever been acquitted where the victim was white. Of the five death sentences rendered in Bay County, all five were black defendants with white victims. Three of the sentences were handed down to Mr. Bates since 1983. The other two death sentences were imposed on Carl Jackson and Eric Turner, whose cases were overturned and reduced to life sentences by the Florida Supreme Court. *See Jackson v. State*, 359 So. 2d 1190 (Fla. 1978); *Turner v. State*, 645 So. 2d 444 (1994)."

have been timely.  The contemporaneous-objection rule does not foreclose objections raised after a witness's testimony, particularly if counsel explains the reason for any delay.

I also fail to see why Bowers would have been conflicted about approaching the bench to request a mistrial.  The upside, securing a mistrial, could not have been more beneficial to Bates given the jury's mounting prejudice against him.  In this context, the prospects for securing a mistrial need not be very great to make it incompetent not to even ask for one.[3]  The Majority suggests that there is a significant downside to asking for a mistrial in the manner just described, but I do not see it.  The Majority explains that approaching the bench would have invited the jury to speculate and that if the objection had been overruled, the jury would have been left bewildered.  Even if this is true, is it really better to leave the jury prejudiced, instead?  I cannot take seriously the notion that prosecutors would voice no objection to beginning a murder trial with a prayer by the defendant's minister, even though all the reasons The Majority discusses for not objecting would be equally applicable in that context.  When God is inserted into a trial on the opponent's side, whatever slight reservations competent attorneys have about raising objections (not wanting to be quarrelsome, not wanting to exhaust the

---

[3] There is no certainty that Bowers's objection, had it been raised, would have been sustained, but by remaining silent, there was a certainty that a mistrial would not be granted.  Depriving a client of a significant, even if not certain, opportunity for a mistrial under these circumstances is incompetent.

court's patience, and not wanting to "bewilder" the jury) pale in comparison to such obvious and significant prejudice.

The Majority opinion further supposes that Bowers may have refrained from objecting because he feared having his objection overruled, but that can hardly justify an attorney's decision not to raise an objection in the first place. If that were an adequate justification, a lawyer could never be faulted for failing to raise an objection because it is always true that an objection *might* be overruled. This logic depends on the fallacy that having an objection overruled is highly counterproductive, such that a lawyer who hears prejudicial testimony is placed in a lose-lose situation: objecting is bad because the objection might be overruled, but remaining silent is also bad because the prosecution may inject even more prejudice into the trial. But here, at worst, Bowers faced a win-no lose situation. Had he raised the objection, he might have secured a mistrial and spared his client from prejudice, but at worst, his objection would have been overruled out of the jury's hearing, leading to a momentary break in the proceedings at an already natural breaking point (between the testimony of two witnesses). In short, Bowers passed up an opportunity for a significant upside in order to avoid a virtually non-existent downside.[4]

---

[4] The Majority opinion insists that we cannot expect competent attorneys to raise objections that are *meritless*. On that point, I agree. But a potentially losing claim is different than a meritless one. We might expect competent counsel to object to highly prejudicial evidence even if there is

Further, the fact that Bowers thought "nothing of the prayer" and that he never even considered moving for a mistrial is all the more reason to believe that his failure to object was incompetent and was not the product thoughtful consideration. He did not balance the pros of objecting to this highly prejudicial evidence against the cons of potentially drawing attention to the prejudice, as the Majority would have it. Instead, Bowers incompetently failed to see the prejudice at all and sat idly by as the court and the prosecution stacked the deck against his

only a 49% chance that the objection will be sustained, but of course if the odds of success are only 1%, competent counsel's calculus may change. This consideration assumes that the objectionable evidence is prejudicial, however, and as the Majority recognizes, in addition to considering the odds of having an objection sustained, competent counsel must also assess whether the evidence is bad for the client. All else being equal, as evidence becomes more prejudicial, competent attorneys will be more willing to raise objections that may not be sustained. And at the other extreme, when an event transpires that does nothing to harm a client's interests, even if it is 100% certain that an objection to the event will be sustained, competent attorneys will not necessarily object because there is nothing to gain by doing so. Relying on this imminently logical proposition, the Majority suggests that if Bates could not ultimately show prejudice for purposes of *Strickland*, then we cannot conclude that his attorney was incompetent for failing to object. To be clear, I believe that Bates can show prejudice for *Strickland* purposes. But even if he could not, I disagree with the Majority opinion's conclusion. The fact that an appellate court may ultimately conclude, looking back, that an error was not prejudicial for *Strickland* purposes does not mean that the potential error was not sufficiently prejudicial to mandate action by a competent attorney on the spot. We assess prejudice for *Strickland* purposes under the totality of the circumstances, with the benefit of all the evidence and with knowledge of all subsequent events. Prejudicial evidence to which an attorney might have objected is often outweighed by subsequent, overwhelming proof of guilt, and we often find that a *Strickland* claim fails on the second prong of the analysis for this reason.
But it would be patently incompetent for an attorney listening to prejudicial evidence during a trial to analyze the effect on his client in the same way. For one thing, he obviously does not know what the totality of the circumstances will be because he cannot predict the future. Further, the fact that subsequent evidence might render earlier prejudice harmless does not mean that a lawyer should simply throw up his hands and allow the prosecution to pile prejudice on top of prejudice. Indeed, if that were the case, a lawyer representing a man confronted with overwhelming evidence of his guilt could never be incompetent under the first prong of *Strickland*. Surely that cannot be. Competent lawyers object to prejudicial testimony even if— perhaps particularly if—the cases against their clients are overwhelming.

60

client.[5]  As I have already said, however, while I believe Bates established a

*Strickland* claim, we cannot grant habeas on this basis because the Florida

Supreme Court's contrary conclusion was not unreasonable.[6]

It is bad enough that, in the course of denying habeas relief on Bates's

*Strickland* claim, the Majority countenances a defense attorney's failure to object

to highly prejudicial proceedings that have no probative value in a trial.  However,

I believe that the manner in which the Majority relies upon Establishment Clause

cases to conclude that Bates's *Strickland* claim fails is even more problematic and

---

[5] The Majority correctly notes that competent attorneys do not make all objections that could be made, even if there is nothing to lose by objecting.  To be clear, I do not find Bates's *Strickland* claim persuasive because there would have been no downside to raising an objection.  Instead, I find Bates's *Strickland* claim persuasive because, in addition to having almost nothing to lose by objecting, Bowers had a lot to gain.  His client was prejudiced by proceedings at trial, and at that point, Bowers had two options: allow the trial to proceed, despite the obvious downside that the trial was infected with prejudice against his client, or object and request a mistrial, which has no perceptible downside and which would have given Bates at least a shot at a new trial uninfected by prejudice.  Faced with these options, competent attorneys do not opt for silence.

[6] The Majority explains that Bowers admitted only that the jury *could* have drawn a prejudicial inference against Bates based on the prayer and subsequent testimony.  From this, the Majority concludes that we would merely be speculating about whether or not prejudice occurred, which is not enough to establish a *Strickland* claim.  This argument misses the point.  Bates's entire argument is that his counsel's barometer for measuring prejudice was not functioning properly, so it does not do much good for us to rely heavily on that barometer now.  While Bowers perceived no prejudice at the time and merely speculated after the fact that there might have been prejudice to Bates, Bates claims there *was* prejudice at trial but only realized later that the potential was there. More to the point, we are not here to evaluate what Bowers believed; instead, we are here to evaluate what objectively competent counsel would have believed and done.  I think competent counsel would have assessed, on the spot, that the prejudice was real, not speculative, and I think competent counsel would have done something about it.

That the record does not reveal much about how prejudicial the testimony in question truly was does not, as the Majority suggests, support the government's position.  Instead, the silence in the record is a consequence of Bowers's failure to perceive the prejudice; it is not a sign that there was no prejudice.  We know that testimony linked the minister, and thus the trial's opening prayer, to the victim, and we know that Bowers did nothing about it, leaving the record on this point underdeveloped.  All this tells us is that Bowers failed to react, not that he had no reason to react.

61

unnecessary.  Because the Florida Supreme Court addressed Bates's *Strickland* claim on the merits, the first question we must address is whether that court unreasonably applied *Strickland* in holding that Bowers's failure to object to a prayer and subsequent testimony was not ineffective.  I agree that it did not, and we could leave it at that.

To be fair, I discussed how I would have addressed the *Strickland* issue were we to analyze the issue de novo, so I cannot quarrel with the Majority's decision to do the same.  I must, however, raise a few issues with the Majority's analysis, which is in deep tension with *Strickland* itself.  To begin with, I would frame the question differently than has the Majority.  The Majority asks only whether Bowers was incompetent for failing to object to the prayer itself.  Had Bowers objected only to the prayer, I agree that his objection might have been best framed as an Establishment Clause challenge.  That is not precisely what Bates claims Bowers should have objected to, however.  Instead, Bates also insists that Bowers was incompetent for failing to object to the prayer *after the husband's testimony* linked the prayer and the minister to the victim.  In other words, we need not address whether the Establishment Clause prevented the trial court from inviting God into the courtroom; rather, we must address whether competent attorneys would object to testimony placing God on the victim's side.  That changes the objection from an Establishment Clause challenge to a run-of-the-mill objection to

62

highly prejudicial testimony that has no probative value.  The Establishment Clause cases cited by the Majority are irrelevant to this inquiry.

Even assuming that we must address whether Bowers was incompetent for failing to raise an initial objection to the prayer itself on Establishment Clause grounds, we have no reason to address the Establishment Clause cases.  As the Majority makes clear, it believes the prayer itself was entirely innocuous, unobjectionable, and did not prejudice the jury against Bates in any way.  The *Strickland* analysis should thus be quite simple: competent attorneys in Bowers's position would not have objected because nothing about the prayer harmed Bates.  The Majority's *Strickland* analysis should stop there.  After all, regardless of the odds of success, why object or ask for a mistrial if there is no reason to think that the next jury will be any more sympathetic (or less prejudiced) than the current one?

To justify discussing the Establishment Clause, the Majority explains that it is only analyzing what a competent attorney in Bowers's position would have done.  In order to do this, the Majority claims we need to know whether Bowers's objection to the prayer itself would have been sustained under the Establishment Clause because that, in turn, informs our analysis of whether a competent attorney in Bowers's position would have objected.  I disagree with both propositions.

63

In analyzing Bates's *Strickland* claim, our goal is to recreate the situation confronting Bowers when he failed to object.  The Majority states that it is reasonable to conclude that counsel's failure to object was not deficient because the "United States Supreme Court has never held that it is a violation of either the Due Process Clause or the Establishment Clause to begin a criminal trial with a prayer, let alone a violation of the Establishment Clause that would require reversal, a mistrial, or any other form of relief."  Maj. Op. at 19.  The Majority also asserts that "we are deciding . . . that given the state of the law at the time of trial (and now), it was (and still is) not *clearly established* that the opening prayer violated the Establishment Clause. . . .  As a result, a reasonably competent attorney could conclude that objecting . . . would not benefit his client."  Maj. Op. at 21, n.9 (emphasis added).

In essence, the Majority is asserting that counsel cannot be found incompetent for failing to raise an objection under *Strickland* unless the Supreme Court has *clearly established* that the unraised objection would have been sustained.  That simply cannot be the case, as competent trial counsel's goal is not to have 100% of his objections sustained; it is instead to secure the most favorable circumstances for his client.  When assessing a trial court's actions, the competent attorney's first question is not, "What have federal courts clearly said on this subject, and if I object, how likely am I to be sustained?"  Instead, the competent

64

attorney's first question is, "Do these actions harm my client's interests, and if so, what are the best arguments I can make to remedy the prejudice that has just occurred?"  If the best argument is one that has neither been explicitly accepted or rejected by federal courts, and counsel decides not to make the argument for that reason, I think that decision would very likely be incompetent.

Indeed, the question of how clearly established the grounds for an objection are in federal law is often largely irrelevant to a trial attorney in state court.  For example, assuming that the Supreme Court *had* clearly established that Bates would have been entitled to a mistrial had Bowers objected to the prayer, competent counsel still may not have objected for reasons wholly unrelated to the clarity of federal law.  If, as the Majority claims, the jury was not prejudiced against Bates either before or after the prayer, then even if Bowers *could* have secured a mistrial, why would he want to?  Competent lawyers do not halt proceedings only to start them over again—even if the Supreme Court has clearly established that they can—when there is no reason to believe that starting over will be any better for their clients.

On the other hand, if Supreme Court precedent was not clearly established one way or the other, and a defendant's trial began with a prayer asking the jury to bring the defendant to justice or to bring closure to the victim's family, the prejudice would be extreme.  In that case, it would likely be incompetent for

65

counsel to do nothing regardless of whether the Supreme Court had *clearly established* that beginning a trial with a biased prayer is grounds for a mistrial, unless he had legitimate strategic reasons for doing nothing.  That case law is not definitive on the issue is no excuse for the attorney to sit in silence and to do absolutely nothing to suggest that gaps in case law be filled in in his client's favor.[7]

In order to justify its discussion of the Establishment Clause in a case about a *Strickland* claim, the Majority explains that counsel cannot be deemed ineffective for failing "to raise *meritless* arguments."  *Diaz v. Sec'y, Dept. of Corr.*, 402 F.3d 1136, 1142 (11th Cir. 2005) (emphasis added).  As the Majority explains, however, the most that can be said of case law regarding any objection Bowers might have raised under the Establishment Clause is that federal law does not *clearly establish* that such an objection would prevail.  I have no problem concluding that attorneys cannot be found incompetent for failing to raise meritless claims, but I think it is entirely different—and highly inappropriate—to suggest that attorneys could never be found incompetent for failing to raise a claim simply because it is not clearly established.  But this is the interpretation of *Strickland* the Majority advances.  Worse still, in a case where our only task is to assess the reasonableness of the

---

[7] Further, from the standpoint of a criminal defense attorney operating in state court, that the Supreme Court has no clearly established precedent does not necessarily suggest that there is a gap in case law at all.  If the Florida Supreme Court had clearly established precedent interpreting the Establishment Clause to forbid prayers at the beginning of a criminal trial and explaining that a mistrial is the only adequate remedy, then the absence of clearly established federal law would be entirely irrelevant to our *Strickland* analysis.

Florida Supreme Court's resolution of a *Strickland* claim, the Majority attempts to convert a potential Establishment Clause claim from "not clearly established" to "meritless." This obvious overreach makes a mess of *Strickland* and potentially forecloses a claim that we have absolutely no reason to address.

At least by explaining that "we are not deciding whether the opening prayer violated the Establishment Clause," Maj. Op. at 21, n.9, the Majority recognizes that whether trials can begin with prayers is still an open question. It is important to point out that this remains true despite the Majority's claim that "federal courts of appeal have rejected *such Establishment Clause challenges* where the content of the prayer did not prejudice the defendant or substantially impair his right to a fair trial." Maj. Op. at 19 (emphasis added). In support of this proposition, the Majority cites *Isaacs v. Head* and *Marsh v. Chambers*, neither of which support the Majority's conclusion. *See Isaacs*, 300 F.3d 1232, 1252–53 (11th Cir. 2002) (rejecting a habeas claim that the state court had unreasonably applied the Supreme Court's Establishment Clause precedent by not reversing a conviction where there had been a prayer to open a trial, reasoning that there was a lack of Supreme Court precedent supporting a reversal); *Marsh*, 463 U.S. 783, 103 S. Ct. 3330 (1983) (holding that a prayer at the commencement of a legislative session did violate the Establishment clause). These cases tell us only that it is not clearly established that Bowers's objection to the prayer would have been sustained. They do not tell us

67

that it should have (or would have) been overruled had it been made, or that the objection would have been meritless such that Bowers cannot be faulted for having failed to raise it. The same can be said of the Supreme Court's recent decision in *Town of Greece, NY v. Galloway*. 134 S. Ct. 1811 (2014) (rejecting an Establishment Clause challenge to opening town board meetings with a sectarian Christian prayer).[8]

Ironically, the Majority emphasizes that Bates cannot disguise an Establishment Clause claim as a *Strickland* claim because he was only granted a Certificate of Appealability (COA) on the *Strickland* issue. *See* Maj. Op. at 14, n.1. Given that Bates is precluded from making an Establishment Clause claim, it is inappropriate—particularly in an AEDPA case concerning a *Strickland* claim— for the Majority to imply that Establishment Clause cases foreclose objections to prayers at the beginning of a trial. Ultimately, however, because of the deference afforded state courts under AEDPA and the absence of clearly established federal

---

[8] The Majority also cites *United States v. Walker*, 696 F.2d 277, 282 (4th Cir. 1982). To be sure, that case advances the argument the Majority unnecessarily makes here that Bowers's objection, had he raised it, might not have been sustained. But the fact that the Majority has to resort to out of Circuit precedent to support its point shows that the question of what might have happened had Bowers objected is an open one in this Circuit. It also underscores how implausible it is to suggest that Bowers was competent based on the assumption that he did not raise an objection because he believed the state trial court would extend the law of our sister Circuit to overrule his objection. It would have been the government's job to argue why the state court should adopt that precedent, and it is competent defense counsel's job, if the objection would benefit his client, to explain why the Fourth Circuit's non-binding case was wrongly decided or is distinguishable. Under the Majority's view, the government's job would become very easy, because as soon as an adverse ruling comes out in any federal court against a defendant's position, apparently competent defense counsel are no longer expected to raise the objection in any other jurisdiction.

68

law of the Supreme Court, I concur in concluding that the Florida Supreme Court's adjudication of the *Strickland* claim was not unreasonable. *See* 28 U.S.C. § 2254(d)(1).

## B.

Bates makes three related claims with respect to revised Florida Statute § 775.082(1), which provides for a possible sentence of life without parole. First, Bates argues that the resentencing judge erred by failing to allow Bates to waive his right against *ex post facto* application of laws in order to apply the newer version of § 775.082(1) to him, which provides a possible sentence of life without parole.[9] Second, Bates maintains that the judge erred by failing to enter Bates's soliloquy seeking retroactive application of the sentencing statute into evidence so that the jury would know that Bates was willing to forego any potential opportunity for parole. Third, Bates argues that the resentencing judge erred by failing to instruct the resentencing jury that Bates had been sentenced to two life terms and one 15-year term for the other crimes which would run consecutively, facts which he believes would have made the jury less likely to recommend death because they

---

[9] Alternatively, Bates maintains that the application of the statute as revised by the Florida Legislature in 1994 would not violate the prohibition against *ex post facto* application of laws. *See Weaver v. Graham*, 450 U.S. 24, 29, 101 S. Ct. 960, 964 (1981) (providing a two prong test to determine if a statute violates the *ex post facto* prohibition, asking (1) is the law retrospective, and if so, (2) if it is disadvantageous to the offender). Here, Bates argues that the amended § 775.082(1), if applied, would be advantageous, not disadvantageous, under the circumstances of his resentencing.

would have known that he would be imprisoned for a long time.[10]  Bates asserts that these failures denied him due process and a fundamentally fair capital sentencing under the Eighth and Fourteenth Amendments.  *See Stringer v. Black*, 503 U.S. 222, 232, 112 S. Ct. 1130, 1137 (1992) ("[W]hen the sentencing body is told to weigh an invalid factor in its decision, a reviewing court may not assume it would have made no difference if the thumb had been removed from death's side of the scale.").

> In its adjudication on the merits, the Florida Supreme Court held:
>
> In Florida, without clear legislative intent to the contrary, a law is presumed to apply prospectively. . . . We find no unequivocal language that the Legislature intended this [1994] amendment to apply retroactively.  We have previously held that this statute was not applicable to crimes committed before its effective date . . . .
>
> Our analysis of this issue causes us to reject appellant's waiver arguments.  Because the 1994 amendment can have no effect on appellant's sentencing, we conclude that the waiver of an ex post facto claim in respect to the 1994 amendment to section 775.082 is of no consequence.  The waiver of ex post facto rights would only be an issue if the statute could have an effect on appellant's sentence which, as we have stated, it cannot.

---

[10] Bates's claim regarding the relevance of his additional life sentences to the resentencing jury is within the broad scope of our COA, which authorized Bates to address "[w]hether the Florida Supreme Court's rejection of Appellant's claim that the trial court's refusal to instruct the jury about Appellant's parole eligibility, including the effect of consecutive sentences he had left to serve, was contrary to law established by the United States Supreme Court or objectively unreasonable in light of such precedent."  I disagree with the Majority's argument that even if Bates's claim is included in our COA, he has abandoned this claim by failing to "plainly and prominently" argue it on appeal.  Maj. Op. at 27, n.13 (citing *Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014)).  Bates has cited the relevant Supreme Court precedents in his appellate brief and specifically argued that the resentencing jury's lack of information about his additional consecutive sentences was unconstitutional.  That is enough to place the issue before us.

Appellant's alternate contention, that the jury should have been advised that appellant would agree to waive the possibility of parole, is also unavailing under Florida's capital sentencing scheme because, as the trial court ruled, "[a] defendant cannot by agreement confer on the court the authority to impose an illegal sentence." *Williams v. State,* 500 So. 2d 501, 503 (Fla. 1986).   At the time appellant committed this murder, the Legislature had not established life without the possibility of parole as punishment for this crime.

In his second issue, appellant argues that the State took advantage of the trial court's failure to instruct the jury on a sentence of life without the possibility of parole during cross-examination of appellant's witnesses and closing argument by making future dangerousness an issue for the jury.  Appellant did not object to either the State's cross-examination or closing argument on this ground, and the issue is therefore procedurally barred.  *Steinhorst v. State,* 412 So. 2d 332, 338 (Fla. 1982).  Moreover, after reviewing the record, we do not agree that the State's cross-examination or argument raised the specter of appellant's future dangerousness. . . .

As part of his third issue, appellant contends that the fact that he was already sentenced to two life terms plus fifteen years and that those sentences were to run consecutively to the sentence for the murder was relevant mitigation "in the sense that [it] might serve as a basis for a sentence less than death."  We have rejected similar arguments in *Franqui v. State,* 699 So. 2d 1312, 1326 (Fla. 1997); *Marquard v. State,* 641 So. 2d 54 (Fla. 1994); and *Nixon v. State,* 572 So. 2d 1336 (Fla. 1990).

These other sentences are not relevant mitigation on the issue of whether appellant will actually remain in prison for the length of those sentences. The length of actual prison time is affected by many factors other than the length of the sentence imposed by the sentencing court. The introduction of this evidence would open the door to conjecture and speculation as to how much time a prisoner serves of a sentence and distract jurors from the relevant issue of what is the appropriate sentence for the murder conviction. Regarding this issue appellant's brief states "[T]he state argued that [appellant] would be eligible for parole after serving the mandatory minimum." Appellant, however,

makes no record reference to support that statement; nor has our independent review of the record revealed support for that statement. As we stated regarding the previous issue, our review of the record causes us to find that the State did not violate *Hitchcock v. State,* 673 So. 2d 859, 860 (Fla. 1996), by injecting appellant's future dangerousness into its evidence or argument. We conclude that the trial court followed our precedent and did not abuse its discretion in respect to this issue.

*Bates v. State*, 750 So. 2d 6, 10–11 (Fla. 1999) (footnote omitted). I note that in his concurrence, Justice Shaw of the Florida Supreme Court emphasized that the question posed by the resentencing jury indicated that they were clearly confused, and the court should have just answered with a simple "Yes" in response to whether the jury was limited to life with a minimum of 25 years or the death penalty, and "No" in response to whether they could recommend life without the possibility of parole. *Id.* at 20 (Shaw, J. concurring). There was also a vigorous dissent in which Florida Supreme Court Justice Anstead, along with two other Florida justices, held that the majority's refusal to accept Bates's waiver of his *ex post facto* rights was "unnecessarily harsh and inconsistent with . . . prior case law." *Id.* at 20 (Anstead, J., dissenting). In fact, Justice Anstead explained that such a waiver would be consistent with prevailing legislative policy, as indicated by the legislative amendment itself, and that the court has repeatedly recognized that a defendant can waive his constitutional protections. *Id.* at 21 (citing *Bowles v. Singletary*, 698 So. 2d 1201 (Fla. 1997); *Melvin v. State,* 645 So. 2d 448 (Fla. 1994)).

Nevertheless, upon review of the relevant Supreme Court precedent, I agree with the Majority here that the Florida Supreme Court's adjudication was not contrary to, or an unreasonable application of, clearly established federal law. With respect to Bates's first two claims, the state court had previously held that this statute was not applicable to crimes committed before its effective date, and there was nothing in its legislative history to indicate that defendants could choose which sentencing statute would apply. *Bates*, 750 So. 2d at 10; *see Hudson v. State*, 708 So. 2d 256, 262 (Fla. 1998). Further, Bates has cited no federal law requiring or even allowing a defendant to waive the laws applicable to his sentencing, regardless of whether such a waiver would be favorable to him or not.

However, Bates's third claim, regarding the jury's knowledge about his other convictions, gives me much pause. The Florida Supreme Court explicitly rejected Bates's argument that the fact that he was already sentenced to two life terms plus 15 years and that those sentences were to run consecutively to the sentence for murder was relevant mitigation "in the sense that [it] might serve as a basis for a sentence less than death." *Bates*, 750 So. 2d at 11. The Florida Supreme Court continued to say:

> These other sentences are not relevant mitigation on the issue of whether appellant will actually remain in prison for the length of those sentences. The length of actual prison time is affected by many factors other than the length of the sentence imposed by the sentencing court. The introduction of this evidence would open the door to conjecture and speculation as to how much time a prisoner

73

serves of a sentence and distract jurors from the relevant issue of what is the appropriate sentence for the murder conviction.

*Id.* Cutting against the Florida Supreme Court's finding that such evidence would be irrelevant, longstanding Supreme Court precedent explicitly holds that evidence which may call for a penalty less severe than death is relevant in a capital sentencing. *See Mills v. Maryland,* 486 U.S. 367, 367–77, 108 S. Ct. 1860, 1867 (1988) (holding that "the risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty is unacceptable and incompatible with the commands of the Eighth and Fourteenth Amendments"); *Lockett v. Ohio,* 438 U.S. 586, 604, 98 S. Ct. 2954, 2964–65 (1978) (holding that "the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death" (emphasis and footnote omitted)).

One of the primary factors that any sentencing body must consider is the need for incapacitation of the defendant in order to protect the public. *See, e.g.*, 18 U.S.C. §3553(a)(2)(c) (stating that one of the primary needs of a sentence is to "protect the public from further crimes of the defendant"). In this case, the resentencing jury was undoubtedly interested in incapacitating Bates because it asked if it could impose a life sentence instead of the death penalty, indicating that

74

some jurors wanted to incapacitate Bates, without the possibility of parole, for longer than the 12 years remaining on the 25-years-to-life sentence that Bates would have received if the jury had voted against death.  Admittedly, guaranteed life without parole was not an option even if Bates's other sentences were considered because it appears that under Florida's previous system of parole, Bates would have been eligible for review for parole, at an absolute minimum, 12 years after the end of his sentence for the first degree murder conviction.[11]  However, given the jury's question, we do not see any limiting principle in *Lockett* that would render it inapplicable.  Indeed, the fact that Bates would be, at a minimum, incarcerated for an additional 12 years following his sentence for first degree murder, bringing total incarceration if the jury voted against death to at least another 24 years, is a "mitigating factor . . . that the defendant proffer[ed]  as a

---

[11] To understand Bates's argument, it is critical to understand the options presented to the jury. The jury was given two choices: vote for death or for a term of life with the possibility of parole after 25 years.  Bates had already served 13 years in prison, so the jury believed it had a choice between death or a life sentence with the possibility that Bates would be a free man in as few as 12 years.  The actual consequences of the jury's vote were quite different.  Bates had been convicted of three other crimes, leading to two additional life sentences and a 15-year sentence, all to run consecutively.  As the Majority explains, each of these sentences carried the possibility of parole.  For each of the two life sentences, Bates would serve a minimum of five years, and for the 15-year sentence, he would serve at least an additional two years.  In total, these other sentences guaranteed that Bates would spend, at the very least, an additional 12 years in prison without eligibility for parole, on top of whatever sentence the capital sentencing jury selected. Thus, while the jury believed that if it did not vote for death, Bates might be free in 12 years, in reality, if the jury did not vote for death, Bates could not have been paroled for at least 24 years. In other words, a vote for life would have left Bates incapacitated for at least twice as long as the jury believed.

Misinformed as it was, the jury's vote for death was still fairly close: 9-3.  It seems reasonable to infer that some jurors who did not believe that 12 years of incapacitation was enough might have believed that 24 years was.

basis for a sentence less than death." *Lockett*, 438 U.S. at 604, 98 S. Ct. at 2964. It is clear from the jurors' question that incapacitation was important to them, but on this critical issue, the jury was kept in the dark.[12]

We recognize that *Simmons v. South Carolina* made a jury instruction on parole ineligibility mandatory only in a context where lifetime ineligibility was at issue, only in the context of rebutting aggravating evidence, and only where the jury itself had a life without parole option. 512 U.S. 154, 175, 114 S. Ct. 2187, 2200 (1994) (O'Connor, J., concurring) (holding that when the state raised the specter of a defendant's future dangerousness, the court violated his due process rights by refusing to instruct the jury that, as an alternative to a capital sentence, the sentence of life imprisonment included absolutely no possibility of parole). *Simmons* did not, however, either foreclose or explicitly extend that mandatory instruction to eligibility for parole for a term of years rather than for a term of life or to sentences rendered for other convictions not before the jury. *Id.* Subsequently, *Ramdass v. Angelone* held that the instruction on ineligibility for parole is only required when ineligibility is established with certainty as a matter of state law. 530 U.S. 156, 166, 120 S. Ct. 2113, 2120 (2000). Thus, *Ramdass* also does not foreclose applying the rule from *Simmons* in a case like this, where there

---

[12] Quite apart from the constitutional question presented here, it also seems to me that when we ask jurors to make morally difficult life-and-death decisions, we ought to fully inform them of the *actual* consequences of their choices.

is certainty under state law that Bates would be ineligible for parole, at a bare minimum, for a term of 12 additional years following the term served for the first degree murder.  Nor does *Ramdass* foreclose application of *Lockett*'s rule that relevant mitigating evidence cannot be kept from a capital sentencing jury.  Indeed, the plurality in *Ramdass* permitted Virginia to insist on certainty before instructing the jury on ineligibility for parole precisely because of how relevant ineligibility for parole is to a sentencing jury.  *Id.* at 180–81, 120 S. Ct. at 2127–28.[13]

Furthermore, *Lockett*'s rule that defendants are entitled to present evidence that may tend to prove to a jury that they deserve a sentence less than death may be sufficiently clear to control this case, even under deferential AEDPA review of state court decisions.  *See Panetti v. Quarterman*, 551 U.S. 930, 953, 127 S. Ct. 2842, 2858 (2007) ("AEDPA does not require state and federal courts to wait for some nearly identical factual pattern before a legal rule must be applied.  Nor does AEDPA prohibit a federal court from finding an application of a principle unreasonable when it involves a set of facts different from those of the case in

---

[13] Further, I do not agree that this Court's decision in *Booker v. Secretary, Florida Department of Corrections*, 684 F.3d 1121, 1126 (11th Cir. 2012), forecloses Bates's claim.  In that case, which presented itself upon habeas review, we found that even if the Florida Supreme Court's resolution of the claim "clearly violates the *spirit* of . . . *Simmons*, that does not mean that it constitutes an unreasonable application of clearly established federal law, which thus far has only addressed jury instructions in the circumstance of statutory parole ineligibility." *Booker*, 684 F.3d at 1126 (internal quotation marks omitted).  At most, *Booker* says that violating the spirit of *Simmons* is not contrary to clearly established law.  To be clear, I believe that *Simmons* and *Ramdass* do not foreclose relief on this claim, and that relief is supported by the Supreme Court's decision in *Lockett* and *Mills*, but I ultimately conclude that, given AEDPA deference, the Florida Supreme Court's adjudication falls short of violating clearly established federal law of the Supreme Court.

which the principle was announced.  The statute recognizes, to the contrary, that even a general standard may be applied in an unreasonable manner." (internal citations omitted)).  Thus, according to the Supreme Court's holding in *Panetti*, the evidentiary rules announced in *Lockett* and *Mills* need not specifically address the instant factual scenario in order to be applied to grant habeas relief.

I think it likely, given the highly relevant nature of incapacitation to jurors when deciding whether to impose a capital sentence, that the Supreme Court would conclude that due process requires including such relevant mitigation evidence in a capital sentencing.  Moreover, the trial court here, unlike the state trial court in *Ramdass,* could have, without "conjecture and speculation," *Bates*, 750 So. 2d at 11, told the jurors of the 12 years of guaranteed incapacitation that Bates would have to serve in addition to what they imposed for the murder conviction.[14]  *Cf. Ramdass*, 530 U.S. at 167, 120 S. Ct. at 2120 (holding that a *Simmons* instruction was not warranted because defendant's third conviction under Virginia's three-strike rule was not final under Virginia law at the time the jury considered the murder sentence).  Thus, I find the Florida Supreme Court's reasons for refusing to permit the jury instruction unpersuasive.

---

[14] We do recognize, however, that while Bates's counsel asked the resentencing judge for an instruction regarding his two additional life sentences and his 15-year sentence, to be served consecutively, the only absolutely definitive period of incarceration, under Florida law at the time, appears to be 12 years to run consecutively to Bates's punishment for first degree murder. The trial judge, when confronted with either counsel's request or the jury's subsequent question, could have explained this to the jury.

Nevertheless, a competing principle announced by the Supreme Court in *California v. Ramos*, that state courts are entitled to deference in determining what evidence may go before a sentencing jury, combined with AEDPA's deferential standard of review, precludes us from applying *Mills* and *Lockett* to this case. *Ramos*, 463 U.S. 992, 1001, 103 S. Ct. 3446, 3453 (1983) (stating that it is ordinarily proper to "defer[] to the State's choice of substantive factors relevant to the penalty determination"). The Supreme Court further reiterated in *Ramdass* that "States are entitled to some latitude [as] the admissibility of evidence at capital sentencing . . . remains . . . an issue left to the States." *Ramdass*, 530 U.S. at 169, 120 S. Ct. at 2122–23. Even the *Ramdass* dissent recognizes the discretion typically afforded to state supreme courts: "This is not to say . . . that the Constitution compels States to tell the jury every single piece of information that may be relevant to its deliberations. Indeed, in *California v. Ramos*, we held it ordinarily proper to defer to the State's choice of substantive factors relevant to the penalty determination." *Id.* at 194–95, 120 S. Ct. at 2135 (Stevens, J., dissenting).

Therefore, despite the Supreme Court's holding in *Panetti* that "AEDPA does not require state and federal courts to wait for some nearly identical factual pattern before a legal rule must be applied," 551 U.S. at 953, 127 S. Ct. at 2858, I conclude that Supreme Court's emphasis on the deference afforded to state courts' evidentiary rulings under AEDPA, in light of the ambiguity in the law created by

79

*Simmons* and *Ramdass*, precludes us from granting Bates habeas on this claim. This highlights a troubling consequence of AEDPA case law: where a precedent cannot obviously be extended to the case we have before us, and where the Supreme Court has spoken in a tangentially related way to the situation at issue without explicitly covering it, we figuratively throw up our hands, repeat the refrain that AEDPA requires deference to state courts, and deny habeas relief. To be clear, I believe that the Florida Supreme Court's determination on this issue was contrary to the rule articulated in *Lockett* and reiterated in *Mills*, but that the more recent precedent in *Simmons* and *Ramdass*, although distinguishable, generates sufficient ambiguity as to preclude relief in an AEDPA context unless or until the Supreme Court tells us otherwise. For these reasons alone, I concur in affirming the district court's decision denying Bates habeas relief.